181 P.3d 415

STATE of Hawai'i, Plaintiff–Appellee,

v.

Kevin POND, Defendant–Appellant.

No. 27847.

Intermediate Court of Appeals of Hawai'i.

Oct. 11, 2007.

Teresa D. Morrison, deputy public defender, State of Hawai'i, for defendant-appellant.

Brandon L.K. Paredes, deputy prosecuting attorney, County of Maui, for plaintiff-appellee.

WATANABE, PRESIDING J., FOLEY, and FUJISE, JJ.

Opinion of the Court by WATANABE, Presiding J.

Following an incident that occurred on December 12, 2005 (the December 12, 2005 incident), Defendant–Appellant Kevin Pond (Pond or Mr. Pond) was charged with, and convicted and sentenced for, Abuse of Family or Household Member in violation of Hawaii Revised Statutes (HRS) § 709–906 (Supp. 2004) [1] (Count 1) and Interference with Re-

---

1. At the time Defendant–Appellant Kevin Pond (Pond) allegedly committed the offenses with which he was charged, the relevant part of Hawaii Revised Statutes (HRS) § 709–906 (Supp. 2004) provided as follows:

**Abuse of family or household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.

For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

(2) Any police officer, with or without a warrant, may arrest a person if the officer has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member and that the person arrested is guilty thereof.

. . . .

(5) Abuse of a family or household member and refusal to comply with the lawful order of a police officer under subsection (4) are misdemeanors and the person shall be sentenced as follows:

porting an Emergency or Crime (the Interference offense) in violation of HRS § 710–1010.5 (Supp.2006)[2] (Count 2). Pond now appeals the Judgment entered by the Family Court of the Second Circuit[3] (the family court) on March 2, 2006, alleging that:

(1) The family court erred in (a) precluding evidence relevant to his self-protection defense that the complaining witness (CW) attacked Pond less than two weeks before the December 12, 2005 incident; and (b) denying defense counsel's motion to continue trial so he could file written notice of intention to use evidence of CW's prior attack, pursuant to Hawaii Rules of Evidence (HRE) Rule 404(b);

(2) The family court erred in preventing Pond from cross-examining CW about her use of marijuana on the night of the incident to attack her perception and recollection of the incident;

(3) The family court erroneously instructed the jury about the justifiable use of protective force;

(4) The family court erroneously instructed the jury as to the state of mind required for conviction on Count 2; and

(5) Misconduct occurred when the deputy prosecutor made comments about the elements of the Interference offense during

> (a) For the first offense the person shall serve a minimum jail sentence of forty-eight hours; and
> (b) For a second offense that occurs within one year of the first conviction, the person shall be termed a "repeat offender" and serve a minimum jail sentence of thirty days.
> HRS § 709–906 (Supp.2004).

**2.** HRS § 710–1010.5 (Supp.2006) provides, as it did when Pond allegedly committed the offenses with which he was charged, as follows:

> **Interference with reporting an emergency or crime.** (1) A person commits the offense of interference with reporting an emergency or crime if the person intentionally or knowingly prevents a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer.
> (2) Interference with the reporting of an emergency or crime is a petty misdemeanor.

**3.** The Honorable Richard T. Bissen, Jr. presided.

Plaintiff–Appellee State of Hawai'i's (the State) closing argument.

We affirm.

## BACKGROUND

### A. The Pre-trial Proceedings

On February 27, 2006, just prior to the commencement of Pond's jury trial, Pond's defense counsel orally moved for a continuance of trial on grounds that "I don't feel that I'm adequately defending this client at this point in time with the evidence that ... we don't have going in." Defense counsel explained that the heart of Pond's defense was self-protection and crucial to this defense was evidence that "[t]wo weeks prior to the [December 12, 2005] incident [CW] attacked [Pond] physically." Defense counsel argued that a continuance was necessary because Pond had not pinpointed until that morning the date on which Pond had been attacked by CW and therefore defense counsel could not have, until that time, filed a notice of intent to introduce such evidence at trial, pursuant to HRE Rule 404(b) (Supp.2006).[4]

The family court acknowledged that HRE Rule 404(b) allows "notice [of the intent to introduce evidence of prior bad acts to] be given before trial, or at trial, or even during trial[.]" It also acknowledged that because

**4.** The relevant part of Hawaii Rules of Evidence (HRE) Rule 404 (Supp.2006) provides as follows:

> **Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.**
>
> . . . .
>
> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. *In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.*
> (Emphasis added.)

notice pursuant to HRE Rule 404(b) requires the date of the prior bad act, "[t]here [was] nothing that [defense counsel] could have done before [that day.]" Nevertheless, the family court denied the motion as "untimely" and remarked as follows:

If [the evidence] goes to the heart of the defense, then it should have been something given more prominence earlier. I can't believe that it's that much to the heart of it based on the way it's dribbling in. I think that's how your client felt.

The case then immediately proceeded to trial.

### B. The Trial Testimony of the State's Witnesses

CW testified that she met Pond during the summer of 2005 and they "dat[ed] for a while" before she moved in with him in October 2005. On the evening of December 12, 2005, she was alone in Pond's residence. At about 5:30 p.m., she had spoken by telephone with Pond, who was then at the Outback Steakhouse.

When Pond arrived home at around 10:30 p.m., she was already asleep. She woke up when she heard noises from the sliding glass door in the living room, which she had locked. CW testified that she got up and walked to the living room to see who was outside and Pond "walked in through the bedroom screen door." She then got back in bed and Pond "was jumping on [her] and climbing on [her], and was kind of like—he was drunk." CW testified that she knew Pond was drunk because "[h]e smelled really bad" and "when [she] spoke to him at five-thirty he also told [her] he was drinking."

CW testified that after she told Pond to get off her, he responded by jumping on her more. Pond "was piling the blankets on top of [her], and [she] was trying to kick them off. And then [Pond] went into the bathroom, and [CW] was trying to fix the blankets." CW then "asked [Pond] what that smell was." In response, Pond "came walking towards [her] and then he slammed [her] face into the bed" with one arm and "had his knee or something behind ... [her] arm," so that her arm and face were in a "weird position" and she "was just buried into the bed and [she] couldn't move." CW testified that she "hurt a lot," "could not breathe[,]" and thought her jaw and arm were going to break. She also explained that while Pond was holding her down, he told her that "the reason why [she] was being punished was because [she] didn't know how to be obedient. And that's the last thing that he wanted to do, was to hurt [her], but that [she] needed to learn how to respect him." CW related that "[e]ventually, [Pond] let go[,]" and after he got off of her, he was "just ranting." She was crying, still on her knees on her bed, and "screaming for help."

Pond approached her again, "grabbed the back of [her] head[,]" told her "to shut up, and he bit down on [CW's] mouth and ... punctured the bottom part of [CW's] mouth" so hard that it "went all the way through. And the other side, it was just very swollen and hard.... and there was blood." She received a scar from Pond's bite.

CW was then asked how she got loose after Pond bit her. She responded, "I think he just let go, and I got up and I was reaching for my purse and phone, and I tried to call the police." Thereafter, CW testified as follows:

[Pond] came over and grabbed the phone from me and knocked it out of my hand, because we were fighting for it, and everything got knocked on to the floor, the phone came apart, the battery came out. And by that time I was on my hands and knees on the floor and trying to pick everything up. And I—my stuff was right to the left of me, and I was also grabbing my things so that I could just get my things and leave.

According to CW, she told Pond she was calling the police and dialed 911 on her phone. She wasn't sure if she pushed the enter button, "but [she] think[s she] did, because when [she] went to the police station, [she] looked at the phone [and] it was on there." She further testified that as she was gathering her things and crying, Pond "said that he would help [her] carry it out or something. He was telling [her] to be quiet and shut up the whole time." Pond then "took [her] arm and put it behind her, and shoved [her] face into the closet door, and

sort of pushed [her] along the door[,]" causing her face and mouth to bleed.

CW expressed that she felt scared and she hurt "[e]verywhere." She also had bruises, welts, cuts, and fingernail marks, some of which lasted "at least a week" and "were still visible like ten days later." Her "hair was [also] falling out." CW related that she then gathered some of her things, left the apartment, and drove to the Maui police station in Lāhainā.

CW denied biting Pond but admitted to "strik[ing] him in self-defense" when Pond "was climbing all over [her], when he came to the bed." CW also related that after the incident, she discontinued living with Pond and stopped dating him.

On cross-examination, the following ensued:

Q. Isn't it true, [CW], that when [Pond] came home that you were, in fact, awake?

A. No, it's not.

Q. And you were, in fact, smoking weed?

[DEPUTY PROSECUTOR]: Objection, Your Honor, may we approach[?]

(Bench conference.)

THE COURT: 404(b) notice on this? Did you give 404(b) notice on this?

[DEFENSE COUNSEL]: No, I didn't.

THE COURT: Prior bad act or—

[DEFENSE COUNSEL]: It's a state of mind.

THE COURT: That she was smoking marijuana?

[DEFENSE COUNSEL]: It's impeachable evidence. It goes to her credibility.

[DEPUTY PROSECUTOR]: It's a crime—

THE COURT: It's a prior bad act. You gave 404(b) notice of it?

[DEPUTY PROSECUTOR]: She has not been read her rights. This is ridiculous to spring this on us.

. . . .

[DEFENSE COUNSEL]: 404(b) is prior bad accidents.

THE COURT: It's other crimes, wrongs, or bad acts.

[DEFENSE COUNSEL]: 404 would be prior to notice, if there are other crimes or wrongs, I don't think 404(b) notice is necessary for that.

THE COURT: Okay. Listen, you're asking her if she committed a crime that evening before he came home, and you haven't even noticed that you're going into this line of questioning, so I'm not going to allow it, and strike it. And you have to move on, okay?

The family court then struck the last question and instructed the jury to disregard it.

CW testified that she informed Maui Police Department (MPD) Officer Jonathan Kaneshiro (Officer Kaneshiro) that she had told Pond she was calling 911. However, she did not know whether Officer Kaneshiro wrote this information down on the statement form that he had her sign. CW was then presented with the statement written by Officer Kaneshiro to "refresh [her] memory[.]" The statement did not mention CW's claim that she had told Pond she was calling 911.

Much of CW's cross-examination constituted foundation for Pond's defense witnesses. CW denied that she was drinking when Pond returned to their home that night. She denied that Pond tried to help her in the bathroom, that they kissed when Pond first came home, that she smelled another woman's fragrance on his person, that she bit him in anger, that she punched Pond, or that Pond was trying to defend himself from her. CW also testified that a week and a half prior to the incident in question, she and Pond had argued, she had thereafter left home, and when she returned the next day, she discovered that her "stuff was outside."

Officer Kaneshiro testified that he was working in the Lāhainā district on the night of December 12, 2005 when CW came to the police station. He had difficulty eliciting a statement from her because she was sobbing and "would break down from time to time." He testified that CW did not appear to be intoxicated and she "had an injury to her mouth, [and] a little bruise around her ... right eye." Officer Kaneshiro testified that he also noticed that "there was bruising on [CW's] left arm, ... from her wrist to her elbow, and from her entire right arm from

the wrist all the way to the shoulder[,]" and that CW also sustained an injury to her lip that "wasn't dripping [blood] or anything, but it looked fresh."

When asked by Officer Kaneshiro to explain what happened, CW stated that after Pond came home, "[they] got into a verbal argument; he began pushing her, and . . . at one point pushed her against the wall." Officer Kaneshiro related that CW also told him that Pond had "hit her in the head, and threw her cell against the wall while she was trying to call 911. And he bit her in the lip or on the mouth, something like that." Officer Kaneshiro testified that he had examined CW's phone and concluded that it had been dropped "a couple times." Although he could see "911" on the recent-call list on CW's phone, he couldn't determine exactly when CW had called 911.

Officer Kaneshiro testified that after he had taken CW's statement, he contacted his beat partner to "let him know that we had an abuse case, and we needed to make an arrest." Officer Kaneshiro thereafter met his partner and another officer at Pond's residence. Pond was asleep when the officers arrived. Officer Kaneshiro knocked on Pond's window, and Pond came to the door. When Officer Kaneshiro identified himself to Pond, Pond "became belligerent" and "began yelling and swearing at [the officers]." Although Officer Kaneshiro informed Pond several times that the officers were investigating a criminal complaint and needed to speak with him, Pond continued to yell at the officers, "flipped [them] off[,]" and "went back to his bedroom."

Officer Kaneshiro testified that he eventually "heard sounds of a scuffle" and "heard one of [his] partners yelling, 'Stop resisting,' so [he] ran around the corner." At that point, Officer Kaneshiro witnessed a scuffle between Pond and Officer Kaneshiro's fellow officers. Pond was lying on the ground "face down with his hands under." Pond was then placed under arrest and transported to the police station to be processed.

Officer Kaneshiro testified that he did not notice any injuries on Pond's body when the officers first arrived at Pond's residence. At the police station, however, he noticed a "contusion or lump on [Pond's] forehead" which he "assumed" occurred when the officers "took [Pond] down." The officer also testified, upon observing Pond in the courtroom, that Pond still had the same lump on his head.[5] Additionally, Officer Kaneshiro acknowledged that it was possible that Pond could have bitten his tongue or lips when he was on the ground lying face down. Officer Kaneshiro recalled that he had asked Pond at the police station whether Pond had any injuries and Pond responded that he had none. Pond also denied "having any kind of physical altercation with [CW]" or that he "picked up [CW's] phone and threw it."

On cross-examination, Officer Kaneshiro was questioned about portions of his written report regarding CW's call to 911.

Q. You did testify that at some point [CW] told you that, "I was going to call 911 and then [Pond] through [sic] my phone." Do you remember if you have had stated in your report whether she actually made it verbally known to [Pond] that that's what she was trying to do or call?

A. I think she said—she told me she was trying to call 911, not that she was going to call 911. But I don't know—in my report, I don't believe—I don't recall whether she told me, specifically, she said, "I'm calling 911," if that's what you're asking.

Q. Okay. Thank you.

Would you agree with me that she wasn't prevented from obtaining medical assistance that night by Mr. Pond—just that night in general?

A. During the incident? No, she mentioned that he was holding her down. Other than that, no.

Q. Would you agree with me that Mr. Pond did not prevent her from making a report to law officers?

A. After the incident finished—concluded, yes.

The final witness for the State was MPD Officer Paul Nagata, whose testimony about

5. Pond later testified that the lump was a "permanent feature" from a construction accident that occurred years before the December 12, 2005 incident.

the details of Pond's arrest essentially corroborated that of Officer Kaneshiro.

The State then rested and Pond moved for a judgment of acquittal. Pond's motion was denied.

### C. *The Trial Testimony of the Defense Witnesses*

Pond's first witness was his brother, Quetzal Chacon (Chacon). Chacon testified that he had met CW "a couple different times." According to Chacon, CW called him the day after the December 12, 2005 incident, very "upset about [his] brother." Defense counsel then asked Cachon if he knew "what [CW] smelled on [Pond] that made her angry or upset[.]" Chacon responded that CW "said incense and herbal[-]smelling perfume."

That same day, Chacon said, he "picked [Pond] up on the side of the road" and Pond was also upset. Chacon testified that he took a photograph, which was admitted into evidence, that fairly and accurately depicted Pond's lip when Chacon picked up Pond. Subsequently, in response to questions posed by members of the jury, Chacon explained that the reason he photographed Pond's lip was that Pond "wanted evidence that . . . he got hurt. . . . So I had a camera in the car, so I said take a picture of that."

Pond was the last witness at trial. He stated that his relationship with CW began in July or August of 2005 as a "congenital [sic] arrangement"—that is, "two adults . . . engag[ing] in sexual activities without having a relationship." In October 2005, CW "ultimately moved into [Pond's] house" and that's when a "romantic relationship" between them began.

Pond described a situation that occurred about a week and a half prior to the December 12, 2005 incident when he arrived home from work and found CW lounging on Pond's bed with her dog.

A. . . . And right when I got in there, I thought I said to her—I thought I made it clear that we weren't going to have animals or pets at the house, and you know, "You need to get the dog off the bed, and please take the dog back to your mother's house."

Q. And what was her response?

A. Her response was, "It's just a dog. It's just cute. It's tiny. It's small. It's not going to hurt anything."

Q. Okay. Then what happened?

A. I began to, you know, refresh her memory that I'm allergic to pets, allergic to cat and dog hair. It wasn't about whether the dog was cute, and tiny, and small and not going to hurt anything. It was about that we had already discussed it, and that it didn't need to be discussed again. It's just that the animal, you know, was—they're hairy and they do shed—

Q. So did this escalate to an argument?

A. It did escalate to an argument.

Q. Could you just—what was the final outcome of this argument?

A. The final outcome was I asked her to take the . dog off the bed and she just continued to try and argue with me about the dog. So I walked over to pick up the dog and take it off the bed, and as I walked over to move it, the dog ran and jumped off and went over—went to another part of the house. And [CW] came over to me and started swearing at me because, you know, of my stance on it, and you know, proceeded to smack me.

THE COURT: Hang on a second, Mr. Pond.

[DEPUTY PROSECUTOR]: Objection, Your Honor, can I approach?

(Bench conference.)

[DEFENSE COUNSEL]: I didn't plan that to come out like that. But I was—again, I'm going to ask that this evidence be admitted under 404(a), and also because self-defense, Your Honor, is at the heart of our defense. I believe the case law is quite clear, including the case that the defense is allowed to introduce evidence of the supposed victim's aggressive tendencies or aggressive behavior. And it is probative as to her self-defense on the date in question.

At that point, the family court reminded defense counsel of its earlier HRE Rule 404(b) ruling and ordered the jury to "disregard the last response made by [Pond]." Pond then testified that he told CW that if

she wanted the dog, "she needed to take the dog, herself, and her belongings and leave, and that the relationship was not going to work out." CW left with her dog, but she and Pond later reconciled.

Pond related that earlier in their relationship, CW made it clear that "she was 35 going on 36. She didn't want to get into this relationship, play house, and not have anything to show for it." Pond suggested that they buy property together and he would come up with the down payment, put her name on the title, "and if the relationship doesn't work six months down the road or however months down the road, we sell the property; she gets half of the earnings and I get the other half." CW agreed to this arrangement, and Pond paid the entire deposit on a piece of property.

Pond stated that because December 12, 2005 was the closing day for escrow on the home that he and CW were buying, he had spent the day going to various clients to collect payment for work he had done for them to cover the deposit required for the closing. At about 4:15 p.m., he was on his way to the bank to get a certified check to be accepted by escrow but needed the dollar amount of the total closing cost. He called CW to locate the dollar amount among some files. However, because she grumbled about not being able to find the amount, Pond had to stop at the house to get the information himself, giving him five minutes to get to the bank before it closed.

Pond stated that at about 5:30 p.m., after he had finished his duties for the day, he went to have dinner at the Outback Steakhouse with a female friend and left at about 8:30 p.m. He then went for "a walk on the beach with a friend." He got home at around 10:00 or 10:30 p.m., walked around to the back of the house where his office is located. Since the sliding door was locked shut, he entered the house through the bedroom. As he entered, he saw CW in the office. Defense counsel asked Pond about what he observed as he entered the house.

Q. Did you notice anything unusual about your house?

A. Well, when I walked in, the place smelled like marijuana. And I looked over into the—I have a little wet bar over in the office, and there was a bottle of Grey Goose vodka that was about half empty.

Q. And this bottle vodka, I'm sorry, this bottle vodka was where?

A. It was in the corner of the office. There is a little wet washing area.

Q. And where do you usually keep that bottle?

A. I know we don't keep alcohol in the house. She purchased it that day, and brought it—I'm assuming—that was, you know, her who drank it because there was nobody else at home when I had gotten there.

Q. In your observation of her, you know, your personal intimate knowledge of [CW], do you believe that she was drinking?

A. I do.

Q. Have you seen [CW] drink before, we're not talking about this, but just in general?

A. Yes, I have.

Q. Where would that be?

A. I've seen her drink at her establishment of work, 7–Pools Lounge.

Pond testified that when he first walked into the room and saw CW, "she looked at me" and "I had kind of a little grin on my face because I thought it was funny that she locked the door. She smirked back at me." Pond then recalled that they "proceeded ... to come together and ... started to kiss." They "kissed for a few seconds, and then at that point, [CW] bit down on [his upper] lip[,]" causing a laceration that resulted in a scar. Pond explained that in order to get CW to release him, he bit down on her lip. Upon questioning by defense counsel, Pond testified as to what happened next.

A. At that point, [CW] backed up, she said, "Where the F" have you been? Who have you been with?" And at that point, on the second phrase that she said that, she punched me in the face.

Q. And what do you mean punch you in the face? Where is this?

A. Well, the first punch was on my left side—the first punch, as she was punching me, she says, "Where were you?" And

344

then I said, I told her, "You know that I was out," and it was none of her business at this point. She punched me and continued, you know, raising her voice, starting to scream, "Where the F' have you been?" Punched me again. And I told her, "Stop it, you can't punch me, you're—I don't think because you're a woman you can sit here and beat me because I'm bigger than you—you can beat me."

Q. Were you trying to—

A. Not at that point, I verbally told her to stop at that point. She did it again, and then—as she started to do it, I started to defend, and try to protect myself from those punches.

Pond alleged that in hitting him, CW also made contact with the right side of his face "[s]everal times[,]" resulting in a laceration on the inner side of his right cheek. Pond demonstrated how he blocked CW's punches and mentioned that CW was "frantic and hysterical." Pond testified that to avoid more punches, he grabbed CW's arms and pushed her back; but she kept coming at him, so he pushed her back even further. Pond explained that CW then fell backwards into the corner of the bed and ended up in a sitting position and started sobbing. According to Pond, after CW had sobbed for about two or three seconds, she jumped back up and ran around the room "looking at things and just grabbed the pedestal on the side of [his] bed, and just with both hands, just threw the candle to the ground," and everything on the pedestal also fell off.

Pond testified that CW continued to run around the bedroom and the office and "then she went into the bathroom and sat down by the toilet and started to cry." Pond described what happened next.

A. And then I went to her—into the bathroom, and just was trying to help her up, trying to, you know—my lip was bloody, her lip was bloody. I was trying to clean up her lip. And she was just sobbing, and she was just—she—she was crying and sobbing, and leaning on me and then off.

And then at that point, ... it was obvious that she wanted to leave. And she—actually, if I could backup [sic]? I did

leave out one thing, and I think that that's important. And that was after she had thrown down the candle, before she went into the bathroom, she picked up her telephone, and was making a phone call. I didn't know what the phone call was. We had argued before, and she had made a phone call, and it was to a friend to go over and stay with her friend.

And I took the phone, and I was—you know, we were rummaging to grab the phone. I took the phone and just dropped it on the bed. I said, "You know what, you just need to get all your stuff, and you need to get out of here. Let's just get your things, and let's just end this."

. . . .

Q. . . . .

Your testimony is that you threw it on the bed. You heard testimony that the phone broke. Do you know anything about that or how that might have happened?

A. Well, you know, there was—it may have not ended up staying on the bed. She was grabbing things, you know, she was still upset. She was still crying. From after I picked her up in the bathroom and I said, "Let's go get your things. Let's get out of here. You need to leave", and as she was picking up and gathering herself, her stuff, she was kind of throwing her things around. . . .

So during that time, she could have grabbed her phone, and threw it right off the bed along with the, you know, many of her other belongings she was throwing.

Pond testified that at no time did CW tell him she was "going to go to the hospital" or "going to the police[.]" He also explained that he never tried to hold CW back from leaving but was actually helping her to get her stuff together so she could leave.

D. *The Court's Jury Instructions and the State's Closing Arguments*

At the close of the evidence, the family court instructed the jury. Jury Instructions 18, 19, 20, and 21 were read without objection as follows:

Instruction 18. A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct. A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstance or believes or hopes they exist. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

Instruction 19. A person acts knowingly [sic] respect to his conduct when he is aware that his conduct is of that nature. A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

Instruction 20. A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature. A person acts recklessly with respect to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances exist. A person acts recklessly with [sic] a respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result. A risk is substantial and unjustifiable if in considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

Instruction 21. In Count II of the complaint, the Defendant, Kevin Pond, is charged with the offense of interference with reporting an emergency or crime. A person commits the offense of interference with reportng [sic] of an emergency or crime if that person intentionally or knowingly prevents a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer. There are two material elements of the offense of interference with reporting an emergency or crime, each of which the Prosecution must prove beyond a reasonable doubt.

These elements, these two elements are that on or about December 12, 2005 in the County of Maui, State of Hawaii, the Defendant, Kevin Pond intentionally or knowingly engaged in conduct; and that said conduct resulted in preventing a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer. The intentional or knowingly [sic] state of mind applies to each element of the offense.

Jury Instruction 26, which was based on a jury instruction proposed by Pond that was modified and given by agreement of the parties, stated, in relevant part, as follows:

Justifiable use of force, commonly known as self-defense[,] is a defense to the charge of the abuse or family household member. The burden is on the Prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable. If the Prosecution does not meet its burden, then you must find the Defendant not guilty.

The use of force upon or towards another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. A person employing protective force may estimate the necessity thereof under the circumstances as he reasonably believes them to be when the force is used without retreating. If, and only if, you find that the Defendant was reckless in having a belief that he was justified in using self-protective force against another person, or that the Defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against the other person, then the use of such protective force is unavailable as a defense to the offense of abuse of family or household member. Force means any bodily impact[,] restraint or confinement[,] or the threat thereof. Un-

lawful force means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force.

During the State's closing argument, the deputy prosecutor told the jury that Count II consisted of only two elements.

Now, let's talk about the phone, with regards to that, there are two elements. On December 12, 2005 Defendant's [sic] intentionally engaged in conduct which resulted in preventing [CW] from calling 911. Defendant intentionally grabbed the phone from [CW]. He, himself, told you that. He grabbed the phone from her. He intentionally engaged in conduct. That conduct prevented her from calling 911. She told you she was calling 911. Officer Kaneshiro looked at her phone and saw that she had called 911. By him grabbing the phone from her, was preventing her from making that call. The law doesn't require [CW] to tell the Defendant she was calling 911. If you look at your instructions it doesn't require that. They keep focusing on it. It doesn't require her to tell him that.

On March 1, 2006, the jury found Pond guilty as charged. On March 2, 2006, the family court sentenced Pond to serve twenty days in jail with credit for time served, one year of probation, and to pay various fees. This appeal followed.

## DISCUSSION

A. *The Family Court Did Not Abuse Its Discretion When It Precluded the Admission of HRE Rule 404(b) Evidence and Denied Pond's Motion to Continue Trial*

HRE Rule 404(b) requires that in criminal cases, a party intending to introduce evidence of a person's "other crimes, wrongs, or acts" "shall provide reasonable notice in advance of trial, or during trial if the court

excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence[.]"

On the morning of Pond's jury trial, defense counsel orally moved to continue the trial on grounds that defense counsel wished to admit evidence that CW had attacked Pond two weeks prior to the December 12, 2005 incident but had been unable to file an HRE Rule 404(b) notice of intention to introduce such evidence. Defense counsel asserted that such evidence was critical to Pond's self-protection defense. Defense counsel also explained that he was not able to file the required notice sooner because Pond could not recall the exact date of the prior incident until the morning of trial.[6]

The family court acknowledged that HRE Rule 404(b) allows "that notice [of intent to introduce evidence of prior bad acts] be given before trial, or at trial, or even during trial" but nevertheless denied Pond's HRE Rule 404(b) request as "untimely." The family court thus implicitly determined that Pond's oral notice of intent to use the prior-bad-acts evidence on the morning of trial did not constitute "reasonable notice[.]"

Subsequently, the family court precluded Pond from questioning CW about whether she was "in fact, smoking weed" on the night of the December 12, 2005 incident because Pond had not provided HRE Rule 404(b) notice that he was going into this line of questioning.

### 1.

The requirement that "reasonable notice" of the intent to use evidence of other crimes, wrongs, or acts at trial be provided in advance of trial was added to HRE Rule 404(b) by the legislature in 1994 pursuant to 1994 Haw. Sess. L. Act 25, § 1 at 114. On its face, HRE Rule 404(b) does not require any particular form or set forth specific time limits for such notice.[7] The Supplemental

---

6. Contrary to defense counsel's apparent assumption, the plain language of HRE Rule 404(b) does not expressly mandate that *written* notice of intention to use evidence of prior bad acts be filed in advance of trial.

7. In contrast, HRE Rule 412(c)(1) (Supp.2006) requires that in a criminal case, if a person accused of committing a sexual offense "intends to offer ... evidence of specific instances of the alleged victim's past sexual behavior, the accused shall make a written motion to offer the evidence

Commentary to HRE Rule 404(b) (Supp. 2006) observes that the notice requirement is "[a]pplicable only in criminal cases" and "the requirement of adversary notification 'of the date, location, and general nature' of any evidence to be offered under subsection (b) is not conditioned upon motion or request."

According to the legislative history of House Bill No. 3511, which was enacted into law as Act 25, "[t]he notice provision parallels the change made in 1991 to the Federal Rules of Evidence [ (FRE) ]." Sen. Stand. Comm. Rep. No. 2744, in 1994 Senate Journal, at 1092. *See also* Hse. Stand. Comm. Rep. No. 567–94, in 1994 House Journal, at 1088. The relevant part of the parallel FRE Rule 404(b) at the time of Pond's trial provided as follows:

> **Rule 404. Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes**
>
> . . . .
>
> (b) *Other Crimes, Wrongs, or Acts.*— Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FRE Rule 404(b) (2006). The Advisory Committee Note to the 1991 Amendments to FRE Rule 404(b) explains as follows:

> The amendment to Rule 404(b) adds a pretrial notice requirement in criminal cases and is intended to reduce surprise

and promote early resolution on the issue of admissibility. . . .

The Rule expects that counsel for both the defense and the prosecution will submit the necessary request and information in a reasonable and timely fashion. Other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request or disclosure will depend largely on the circumstances of each case. . . .

Likewise, no specific form of notice is required. The Committee considered and rejected a requirement that the notice satisfy the particularity requirements normally required of language used in a charging instrument. *Cf.* Fla. Stat. Ann. § 90.404(2)(b) (written disclosure must describe uncharged misconduct with particularity required of an indictment or information). Instead, the Committee opted for a generalized notice provision which requires the prosecution to apprise the defense of the general nature of the evidence of extrinsic acts. . . .

The amendment requires the prosecution to provide notice, regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal. The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. Because the notice requirement serves as *condition precedent* to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.

Nothing in the amendment precludes the court from requiring the government to provide it with an opportunity to rule *in limine* on 404(b) evidence before it is offered or even mentioned during trial. When ruling *in limine*, the court may re-

---

not later than fifteen days before the date on which the trial in which the evidence is to be offered is scheduled to begin, except that the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the

issue to which the evidence relates has newly arisen in the case." HRE Rule 412(c)(2) (Supp. 2006) also requires that the motion described in HRE Rule 412(c)(1) be accompanied by a written offer of proof and that a hearing be held to determine the admissibility of the proffered evidence.

quire the government to disclose to it the specifics of such evidence which the court must consider in determining admissibility.

The amendment does not extend to evidence of acts which are "intrinsic" to the charged offense, *see United States v. Williams*, 900 F.2d 823 (5th Cir.1990) (noting distinction between 404(b) evidence and intrinsic offense evidence). Nor is the amendment intended to redefine what evidence would otherwise be admissible under Rule 404(b). Finally, the Committee does not intend through the amendment to affect the role of the court and the jury in considering such evidence. *See Huddleston v. U.S.*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

FRE Rule 404(b) Advisory Committee's Note to 1991 Amendments, *reprinted in* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* at 438–39 (Supp.2007) (emphasis added).

In *United States v. Long*, 814 F.Supp. 72 (D.Kan.1993), the United States District Court of Kansas held that the purpose of FRE Rule 404(b)'s notice requirement

> is to reduce surprise and promote early resolution of the issue of admissibility. The "generalized notice provision" requires the prosecution to "apprise the defense of the general nature of the evidence of extrinsic acts." The court has the discretion to determine whether a particular notice is not reasonable due to incompleteness. The notice requirement is a *prerequisite* to admissibility of the Rule 404(b) evidence. Hence the offered evidence is inadmissible if the court determines that the notice requirement has not been met.

*Id.* at 73 (emphasis added, citations omitted). The court in *Long* found that the government's notice was inadequate to comply with the notice prerequisite to the admissibility of HRE Rule 404(b) evidence because

> [t]he notice does not provide the defendant information concerning the general nature of the evidence the government intends to introduce, as the rule expressly requires. At best, the notice simply forewarns the defendant that the government intends to introduce evidence of other crimes,

wrongs, or acts. Although the government's notice states the name of a government witness who will testify consistent with his prior statement, the notice itself does not describe the nature of the defendant's prior conduct the government intends to introduce through [a witness].

*Id.* at 73–74.

The notice requirement of HRE Rule 404(b) differs from its federal counterpart in three ways. First, HRE Rule 404(b) applies to both parties. Thus, a criminal defendant intending to use a prior bad act as evidence, as exemplified in this case, must give the prosecution reasonable notice of his or her intent to use such evidence at trial. Second, HRE Rule 404(b) requires notice of the date and location of the prior bad act, in addition to a description of the "general nature" of any evidence. Therefore, while the notice requirement is intended to reduce surprise and promote early resolution on the issue of admissibility, the rule, by calling for more specific information such as dates and locations, may actually delay the giving of the required notice. And third, the right to receive notification from an adversary of the date, location, and general nature of any HRE Rule 404(b) evidence to be utilized at trial is not dependent on the filing of a motion or request for such notification. Despite these differences, the two rationales for having a notice requirement—prevention of surprise at trial and the early resolution of admissibility issues—are still relevant in determining the reasonableness of notice provided.

2.

At least two other jurisdictions have addressed the reasonableness of notices provided pursuant to a state evidence rule comparable to FRE Rule 404(b).

In *Hatcher v. State*, 735 N.E.2d 1155 (Ind. 2000), the Indiana Supreme Court was asked to determine whether the state's six-day notice to a criminal defendant of intent to offer evidence of other crimes, wrongs, or acts at trial was reasonable under Indiana Rules of

Evidence Rule 404(b).[8] In holding that the notice was reasonable, the Indiana Supreme Court looked to the circumstances of the case in light of the purpose behind the notice provision.

> [T]here is " 'no hard and fast' rule governing the time period in which the State should respond to an appropriate request under 404(b)." The reasonableness of the State's notice is not merely a function of its relation in time to either the defendant's request for notice or the date of trial. Determining whether the State's notice was reasonable requires an examination of whether the *purpose* of the notice provision was achieved in light of the circumstances of a particular case. The purpose of the reasonable notice requirement in Rule 404(b) "is to reduce surprise and to promote the early resolution of questions of admissibility."

*Hatcher v. State*, 735 N.E.2d 1155, 1158 (Ind. 2000) (citations and footnotes omitted). The court in *Hatcher* concluded that the defendant was not surprised by the state's notice detailing the Rule 404(b) evidence to be offered. *Id.* at 1158–59. Additionally, the notice given to the defendant

> was sufficient to promote the early resolution of questions of admissibility. As a preliminary matter, the trial court heard [the defendant's] objections and argument regarding the reasonableness of the State's notice and the admissibility of each item and witness contained in the notice, "one at a time." During this hearing, the State provided a summary of each witness' [sic] testimony.
>
> In these circumstances, the trial court was warranted in finding that the State's six-day notice was reasonable.

*Id.* at 1159 (record citations omitted).

In *Scott v. State*, 57 S.W.3d 476 (Tex.App.-Waco 2001), the Texas Court of Appeals held that the reasonableness of a notice provided pursuant to Texas Rules of Evidence Rule 404(b)[9] must be determined by examining the facts and circumstances of each individual case.

> Not surprisingly, courts cannot agree on what constitutes a sufficient amount of time to be "reasonable." We have stated that notice provided ten days before trial will be presumptively reasonable. We have also stated that three days' notice over a weekend is presumptively unreasonable. The timing of the defendant's request, however, can have some bearing on the reasonableness of the timing of the State's notice. For example, five days' notice was determined reasonable when the defendant had made his request only two weeks earlier.
>
> *In reality, "reasonable notice" depends upon the facts and circumstances of each individual case.* Therefore, courts have examined factors other than the actual time frame to determine whether notice was reasonable. Some ... have focused on the defense. In *Self* [*v. State*, 860 S.W.2d 261 (Tex.App.-Fort Worth 1993) ], the court held that because defense counsel was able to cross-examine witnesses about the specifics of the extraneous acts, there was no surprise and, therefore, notice of the State's intent to introduce evidence of these acts was adequate. We agreed with the *Self* court when we stated that the purpose of reasonable notice is "to allow the defendant adequate time to prepare for the State's introduction of the extraneous offenses at trial."

*Id.* at 480 (emphasis added, citations omitted).

 We agree with the case-by-case approach that the Texas and Indiana courts need not state the date and location of the prior bad act. See Tex.R. Ev. 404(b) (West, Westlaw 2007) (evidence of other crimes, wrongs, or acts is admissible for purposes other than proving character "provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.").

---

8. The language of Indiana Rules of Evidence Rule 404(b) at issue in *Hatcher v. State*, 735 N.E.2d 1155 (Ind.2000), was identical to the language of Federal Rules of Evidence (FRE) Rule 404(b).

9. The Texas version of Rule 404(b) is closer to FRE Rule 404(b) than to HRE Rule 404(b). In Texas, "reasonable notice" is required only upon request from the defendant. Moreover, notice

have adopted in assessing the "reasonableness" of the notice required by HRE Rule 404(b). Additionally, since a trial court's determination of the reasonableness of an HRE Rule 404(b) notice involves a "judgment call[,]" the determination is reviewed on appeal for abuse of discretion. *See State v. Richie*, 88 Hawai'i 19, 37, 960 P.2d 1227, 1245 (1998).

### 3.

■ It is undisputed in this case that Pond did not provide notice of his intent to use HRE Rule 404(b) evidence until just before trial was to begin, with more than sixty prospective jurors summoned for Pond's trial waiting outside the courtroom. Defense counsel admitted to being aware of the evidence but stated that he could not provide earlier notice under HRE Rule 404(b) because Pond was unable to recall the specific date of the prior bad act involving CW until that morning. Pond never explained, however, why he could not have provided earlier notice of the approximate time period of the alleged bad act, as well as the location and the general nature of the evidence.

The family court determined, based on the circumstances of this case, that Pond's notice was untimely. The family court also expressed that Pond should have "given more prominence" to pinpointing the date of the prior-bad-act evidence if such evidence was so crucial to his defense. The family court thus implicitly concluded that Pond had not demonstrated that good cause existed to excuse his failure to provide pretrial notice.

As discussed above, the purpose of the pre-trial-notice requirement is to reduce surprise and promote early resolution of admissibility questions. Moreover, the notice requirement is a condition precedent to the admissibility of HRE Rule 404(b) evidence. In light of the record in this case, the family court's decision to preclude the admission of evidence that CW allegedly struck Pond on a prior occasion did not constitute an abuse of discretion. Additionally, the family court's refusal to continue the trial to allow Pond to provide HRE Rule 404(b) notice in advance of a rescheduled trial was not an abuse of discretion.

■ Similarly, no abuse of discretion occurred when the family court precluded Pond from cross-examining CW about her alleged marijuana use on the night of December 12, 2005. Pond admitted that he had not provided the required HRE Rule 404(b) notice of his intent to use evidence of CW's alleged criminal violation, a condition precedent to admissibility of such HRE Rule 404(b) evidence.

### B. *The Family Court Did Not Err in Instructing the Jury About the Self–Protection Defense*

■ Pond contends that the family court failed to properly instruct the jury about the self-protection defense because the court's instruction did not include the following language:

> The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

As a result, Pond maintains, the jury was not instructed that the reasonableness of a defendant's belief that the use of force is justified for self-protection "begins and ends with a reasonable person in the defendant's position. In other words, [Pond's] viewpoint was the only relevant starting point of analysis and the jury was never apprised of this critical point."

■ In *State v. Pemberton*, 71 Haw. 466, 796 P.2d 80 (1990), the Hawai'i Supreme Court stated that

> [u]nder Hawaii law, the standard for judging the reasonableness of a defendant's belief for the need to use deadly force is determined from the point of view of a reasonable person in the defendant's position **under the circumstances as he believed them to be.** The jury, therefore, must consider the circumstances as the defendant subjectively believed them to be at the time he tried to defend himself.

*Id.* at 477, 796 P.2d at 85 (citation omitted). In other words, it is "error to judge the

reasonableness of a defendant's viewpoint based on circumstances 'shown in the evidence' but of which the defendant is not 'aware.'" *State v. Augustin,* 101 Hawai'i 127, 128, 63 P.3d 1097, 1098 (2002).

The instruction read to the jury in this case included the following language:

> The use of force upon or towards another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person. A person employing protective force may estimate the necessity thereof under the circumstances as he reasonably believes them to be when the force is used without retreating.

The foregoing instruction is consistent with the language of the statute of self-protection defense, HRS § 703–304(3) (1993).[10] Under this instruction, use of force is justified when *a person* using the force reasonably believes that such force is necessary. This language adequately prohibits the jury from assessing those circumstances unknown to the defendant at the time.

C. *The Family Court Incorrectly Instructed the Jury as to the Elements of the Interference Offense, but the Error was Harmless*

1.

■ HRS § 701–114 (1993) provides as follows:

> **Proof beyond a reasonable doubt.** (1) Except as otherwise provided in section 701–115,[11] no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:
>
> (a) Each element of the offense;
>
> (b) The state of mind required to establish each element of the offense;
>
> (c) Facts establishing jurisdiction;
>
> (d) Facts establishing venue; and

> (e) Facts establishing that the offense was committed within the time period specified in section 701–108.
>
> (2) In the absence of the proof required by subsection (1), the innocence of the defendant is presumed.

(Footnote added.) HRS § 702–204 (1993) specifies that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." Pursuant to HRS § 702–205 (1993), the elements of an offense are defined as

> such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:
>
> (a) Are specified by the definition of the offense, and
>
> (b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

The circuit court instructed the jury that a person commits the Interference offense

> if that person intentionally or knowingly prevents a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer. There are two material elements of the offense of interference with reporting an emergency or crime, each of which the Prosecution must prove beyond a reasonable doubt.
>
> These . . . two elements are that on or about December 12, 2005 in the County of Maui, State of Hawaii, the Defendant, Kevin Pond[,] intentionally or knowingly engaged in conduct; and that said conduct resulted in preventing a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer. The intentional or

---

**10.** HRS § 703–304(3) (1993 & Supp.2006) provides, in relevant part, as follows:

> **Use of force in self-protection** . . . .
>
> . . . .
>
> (3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the ne-

cessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

**11.** HRS § 701–115 (1993) relates to defenses.

knowingly [sic] state of mind applies to each element of the offense.

Pond argues that the family court failed to properly instruct the jury regarding the state of mind required for conviction of the Interference offense. Specifically, the family court failed to properly identify the elements of the Interference offense and improperly combined the results-of-conduct and attendant-circumstances elements of the offense into one instruction. The State concedes that the family court improperly combined the attendant-circumstances and results-of-conduct elements but argues that this error was harmless beyond a reasonable doubt. We agree with the State.

### 2.

█ We note, first of all, that Pond did not object to the instruction. In *State v. Nichols*, 111 Hawai'i 327, 141 P.3d 974 (2006), the Hawai'i Supreme Court held that since the duty to properly instruct the jury lies with the trial court, erroneous instructions that were not objected to at trial must be examined on appeal for harmless, rather than plain, error. *Id.* at 335–37, 141 P.3d at 982–84. That is, "once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt." *Id.* at 337, 141 P.3d at 984.

The circuit court's instruction in this case was similar to the instruction at issue in *State v. Aganon*, 97 Hawai'i 299, 36 P.3d 1269 (2001). In *Aganon*, the defendant, Aganon, was charged with Murder in the Second Degree after a child she was caring for had difficulty breathing and subsequently died. The circuit court instructed the jury, in relevant part, as follows:

A person commits the offense of Murder in the Second Degree if [he or] she intentionally or knowingly causes the death of another person. There are two material elements of the offense of Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are: (1), that on or about the 21st day of October, 1997, to and including the 24th day of October, 1997, on the island of Oahu, in the City and County of Honolulu, State of Hawaii, Aganon caused the death of Karie Canencia. And, (2), that Aganon did so intentionally or knowingly.

*Id.* at 301, 36 P.3d at 1271 (brackets omitted). Utilizing the language contained in HRS § 702–206(1) and (2), the circuit court then separately instructed the jury about the definitions of "intentionally" and "knowingly" as they relate to the conduct, results-of-conduct, and attendant-circumstances elements of the offense. *Id.* at 301–02, 36 P.3d at 1271–72. However, the circuit court did not identify for the jury what constituted the alleged conduct, attendant-circumstances, and results-of-conduct elements of Murder in the Second Degree.

On appeal, Aganon argued that the circuit court's jury instructions were

plainly erroneous because (1) they failed to set out that the elements are conduct and result, (2) they improperly claimed that state of mind is a material element, (3) they failed to require the jury to find that the state of mind applies to each element of the offense, and (4) they allowed the jury to conclude guilt without finding that Aganon committed each element of the offense with the requisite state of mind.

*Id.* at 303, 36 P.3d at 1273. The Hawai'i Supreme Court noted that there were two elements of the Murder in the Second Degree offense.

Any voluntary act (e.g., physical abuse) or omission may satisfy the conduct element of the offense. The death of another person, as the intentional or knowing result of the conduct, constitutes the result element of the offense.

*Id.* The supreme court held that the circuit court "incorrectly listed 'conduct' and 'result' together as one element" and directed that on remand, "the elements of 'conduct' and 'result' should be separately listed." *Id.* Nevertheless, the supreme court concluded as follows:

Although the circuit court erroneously listed the requisite state of mind as a "material element," contrary to HRS § 702–205, *see State v. Klinge*, 92 Hawai'i 577, 584 n. 3, 994 P.2d 509, 516 n. 3 (2000), *the error did not adversely affect Aganon's substantial rights. The court's jury instructions were consonant with the spirit of HRS § 702–204, which prescribes that the requisite state of mind applies to each element of the offense. Thus, the jury instructions were substantively, if not technically, correct.*

*Id.* (emphasis added). The supreme court determined, however, that the circuit court's erroneous response to a jury communication [12] "adversely affected Aganon's substantial rights and, as such, constituted plain error[,]" warranting vacatur of Aganon's conviction and sentence and a remand for a new trial. *Id.* The supreme court explained that based on the circuit court's response, the jury "could have found that Aganon possessed the requisite state of mind with respect to her conduct (physical abuse of [the child] ), but not with respect to the death that resulted. By virtue of the circuit court's erroneous response to the jury's question, the jury could have found Aganon guilty of second degree murder, even though it did not find the requisite state of mind with respect to 'each element of the offense.'" *Id.* (citations omitted).

### 3.

■ In this case, as in *Aganon*, the circuit court's instruction erroneously combined two elements of the offense. Here, the elements of results of conduct (that Pond prevented CW from calling 911) and attendant circumstances (that CW was a victim of a crime) were combined. (In *Aganon*, the "conduct" and "result" elements were erroneously combined.) The circuit court's instruction also provided the definitions of "intentionally" and "knowingly" as set forth in HRS § 702–206 and informed the jury that the requisite state

of mind applied to each element of the offense.

Under *Aganon*, the better practice would have been for the circuit court to list separately the elements of conduct, results of conduct, and attendant circumstances of the Interference offense. However, in *Aganon*, the supreme court concluded that the circuit court's instruction, while technically erroneous, was substantively correct since it contained the essential elements of Murder–in–the–Second–Degree offense and correctly stated that the "intentional or knowing" state of mind applies to "each element of the offense." *Id.* We also conclude, based on our review of the record on appeal in light of *Aganon*, that the circuit court's instruction did not adversely affect Pond's substantial rights. It is reasonably clear from the instruction that the jury was required to find that the defendant (1) intentionally or knowingly engaged in conduct, and (2) intended or knew that such conduct prevented a victim or witness to a criminal act from calling the 911 emergency system. Even though the second element combined both the results-of-conduct and attendant-circumstances elements, it is reasonably clear under the instruction that the "intentional or knowing" mental state applied to both elements. In other words, the jury would not be misled into believing that it could convict Pond without finding that he knew that (1) CW was the victim of a crime (attendant circumstances), and (2) he was preventing CW from calling 911 when he took the phone away from her (results of conduct).

### D. The Deputy Prosecutor Did Not Commit Prosecutorial Misconduct in Her Closing Arguments

■ During her closing argument, the deputy prosecutor said that "there are two elements" to the Interference offense. She told the jury that Pond grabbed the phone from CW, thereby engaging in conduct, and that as a result of the conduct, CW was

---

12. While deliberating, the jury sent the following communication to the judge:

> Regarding definitions of intentionally and knowingly in the instructions, three conditions/definitions are present for each word.

Must all three be true, or is agreement with one of the three sufficient to be so defined? The judge responded, with no objection from Aganon, that "[u]nanimous agreement with one of the three is sufficient." *State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001).

prevented from dialing 911. The deputy prosecutor also emphasized that "[t]he law doesn't require [CW] to tell [Pond] she was calling 911." Pond contends that the deputy prosecutor committed misconduct by misstating the law with respect to Pond's state of mind. Indeed, the State did not mention the attendant—circumstances element—that Pond had to intend or know that CW was a victim or witness to a criminal act.

The Hawai'i Supreme Court has stated that

"[p]rosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, the reviewing court considers the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant."

State v. Kupihea, 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (citations and brackets omitted).

Based on our review of the record, we cannot conclude that Pond was prejudiced by the deputy prosecutor's closing argument. The circuit court instructed the jury that it had to find that Pond's conduct "resulted in preventing a victim or witness to a criminal act from calling a 911–emergency telephone system, obtaining medical assistance, or making a report to a law enforcement officer" and that the "intentional or knowingly [sic]

state of mind applies to each element of the offense." Thus, the jury was instructed that it had to find beyond a reasonable doubt that the elements of results of conduct and attendant circumstances of the Interference offense were established.

The circuit court also instructed the jury that "[s]tatements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretation of the evidence." Additionally, the circuit court instructed the jury, immediately prior to closing arguments, as follows:

Ladies and gentlemen, the lawyers will now make their closing arguments. What they say is not evidence. You are not bound by how they interpret or remember the evidence. The only evidence which you must consider in deliberations comes from the witness's testimony, and from the exhibits which are in evidence.

We presume that the jury adhered to the court's instructions. Id. at 317–18, 909 P.2d at 1132–33.

## CONCLUSION

In light of the foregoing discussion, we affirm the Judgment entered by the family court on March 2, 2006.