209 P.3d 1234

STATE of Hawai'i, Plaintiff–Appellee,

v.

Francis K. KEKONA, Defendant–Appellant,

and

Tammy Antonio, Defendant.

No. 28634.

Intermediate Court of Appeals of Hawai'i.

May 11, 2009.

As Corrected Aug. 12, 2009.

second degree in violation of Hawaii Revised Statutes (HRS) §§ 705–500 (1993), 707–701.5 (1993), and 706–656 (1993 & Supp.2008);[2] carrying, using, or threatening to use a firearm in the commission of a separate felony in violation of HRS § 134–6(a) and (e) (Supp. 2005); ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes in violation of HRS § 134–7(b) and (h) (Supp.2005); and place to keep pistol or revolver in violation of HRS § 134–6(c) and (e) (Supp.2005).

Kekona contends that: (1) the circuit court erred when it granted the motion in limine filed by Plaintiff–Appellee State of Hawai'i (State or prosecution) to prohibit him from introducing evidence of alleged acts of prior physical abuse of Kekona's girlfriend, Tammy Antonio (Antonio), by Sargent Ah Loo (Ah Loo), with whom Antonio had three children (motion in limine); (2) the circuit court erred when it overruled his trial counsel's objection to the State's closing statement that Kekona's self-defense argument could be rejected if the jury believed that Kekona had shot at Ah Loo with the intent to scare Ah Loo; and (3) the State committed seven separate acts of misconduct that cumulatively deprived him of his right to a fair trial.

We vacate the judgment and remand this case for a new trial.

William H. Jameson, Jr., on the briefs, for Defendant–Appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

Defendant–Appellant Francis K. Kekona (Kekona) appeals from the judgment entered by the Circuit Court of the First Circuit[1] (circuit court) on June 4, 2007, convicting and sentencing him for attempted murder in the

## BACKGROUND

The charges against Kekona stemmed from an incident that occurred on December 27, 2005 in the parking lot of the Waimalu Shopping Plaza.[3] During the incident, Kekona, who was the front-seat passenger in a purple Eagle Vision sedan (car or purple car) driven by Antonio, got out of the car and shot at the windshield on the driver's side of a blue Dodge Caravan (van or blue van) driven by Ah Loo.

### A. *The Motion in Limine*

On March 12, 2007, prior to the commencement of trial, the circuit court held a hearing

---

1. The Honorable Virginia Lee Crandall presided.

2. The current version of HRS § 706–656 has not changed since it was allegedly violated by Kekona.

3. At trial, witnesses sometimes referred to the "Waimalu Shopping Plaza" as "Waimalu Shopping Center[.]"

on a motion in limine that the State had filed on March 9, 2007, which sought in part to prohibit "any comment upon or reference to any allegation that [Ah Loo] had physically abused [Antonio] prior to December 27, 2005[.]"

Kekona argued that he was "entitled to prove to the jury that there were prior acts of abuse[,]" there was a good-faith basis for inquiring into these matters, and the prior acts of abuse were relevant to explain to the jury why there was a high-speed chase between Antonio and Ah Loo. Kekona's counsel represented that it was his understanding that Ah Loo had abused Antonio "many times in the past before the 27th and that included not only kicking, punching, and slapping but also verbal abuse." Kekona's counsel also mentioned that two of Ah Loo and Kekona's daughters had told him that they had seen Ah Loo "beat [Antonio] in the past. They had seen [Ah Loo] ram [Antonio's] car. They were in the car in the past" when Ah Loo tried to ram Antonio's car. Kekona's counsel also argued:

> [Ah Loo] at the preliminary hearing made it appear as if he was just following [Antonio] because he wanted to talk to her and he wanted her to come home. In fact what the evidence I would suggest would tend to show is that he wasn't just following her to talk to her. He was jealous. He was obsessed with her. He was trying to do everything he could to make her stop. The issue in this case if he comes to court and tries to present a picture of I just wanted her to pull over so I could talk to her, to me, he's making—opening up his credibility. Is that so? Why would [Antonio] keep running away if that's all you wanted to do?

> So I think I'm entitled to show the jury that there was good reason and we cannot separate the acts of abuse from his pursuit of [Antonio] in this particular case. I would have given more notice if I was specific myself about when these things happened. But, as I said, I needed [Antonio's] cooperation which is why I asked the

court to order her to stay in touch with me.

> I know from brief conversations with her and from her daughters that in fact there were these abuses. They did occur before December 27th of 2005. It did include prior acts of ramming the car that she was in. One of the issues in this case is whether he's just following her so he can talk to her or whether or not he's so jealous by seeing her with other men that he actually wants to hurt her again.

> So I believe that it is relevant, and the State is not surprised. And when I talk to [Antonio], maybe I can be more specific; although, I don't know if she can give me specific dates either other than it happened within maybe months before or weeks before or maybe, uh—yeah, months or weeks before the 27th of December. But certainly it has to be relevant because there's a—either there's a chase in this case like we are saying or [Ah Loo] was just following benignly behind her because he wants to talk to her. So he makes it an issue.

> And it also would tend to show, I would suggest to the court, that if they believe that he was chasing her because he was obsessed with her because—and she had good reason to be afraid of him, if he admits that, then that would have a bearing on self-defense in this case. Because if he was angry enough to hurt her, he might be angry enough to hurt whoever else was in the car.

> So I don't think there's any way we can leave it out just because the State did not give prior notice especially when the State is the one who brought this meaning the State has to have known about it. So I would respectfully submit to the court I ought to be allowed to cross examine [Ah Loo] on the fact that he had beaten [Antonio] in the past, rammed her car in the past, threatened her in the past all before the date in question.

The prosecution argued that Kekona's failure to comply with Hawaii Rules of Evidence (HRE) Rule 404(b) (1994)[4] and provide spe-

---

4. HRE Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissi-

cific notice of particularized events of abuse, including the nature of the allegations of abuse, and the date and location of the abuse, precluded the admission of such evidence. The prosecution also argued:

> Even if the court were to consider its relevance, the State respectfully submits it's tenuously relevant in this case because it's not Antonio's actions vis-a-vis Ah Loo's based on their past history but [Kekona's] actions vis-a-vis [Ah Loo]. More specifically, [Kekona] isn't saying that in the past he and [Ah Loo] had gotten into it and based on this prior history he was aware of [Ah Loo's] physical or characteristics of physical aggression. More specifically a self-defense speaks to his perspective, his perception, and the like, not what he did in regards to [Antonio].

In response, Kekona's counsel argued that the purpose of HRE Rule 404(b) is "to prevent surprise" and

> [t]here is no surprise here, and there's adequate time to talk to [Ah Loo] and say look, they gonna come to court. They gonna say you beat her in the past. You actually rammed … her car in the past with your own children in the car. And he can either tell the prosecutor no, that never happened and be prepared to, you know, weather cross-examination that way or he could say, yeah, that happened, and maybe that might change the whole posture of the case, and maybe we can work out something else in this case.

The circuit court granted the State's motion "as to prior physical abuse on grounds of relevance, confusion of the issues, [and] undue prejudice" and denied the motion without prejudice as to the issue of "the prior conduct of ramming the cars. That's probative with respect to issues of credibility."

ble to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or acci-

### B. *The Trial*

Trial began on March 15, 2007 and ended on March 22, 2007. Relevant to this appeal was the testimony of the following individuals:

#### 1. *The State's Witnesses*

##### a. *Justin Aiu*

Honolulu Police Department (HPD) officer Justin Aiu (Officer Aiu), testified that on December 27, 2005, he heard a call for patrolling officers to be aware of a possible weapons-type case involving a vehicle heading toward Halawa Housing. He headed toward the Halawa Housing area and saw a purple car that matched the description in the announcement. The purple car was stopped in the middle of the road, along with a white-colored van and a darker, blue-colored van.

According to Officer Aiu, as he got out of his vehicle to approach the purple car, a female, later identified as Antonio, got out of the purple car "and she was pretty frantic, screaming and shouting, started coming up to me." Officer Aiu testified that Antonio shouted something to the effect that "We were chasing each other. He was ramming my car, so I shot him. I shot him."

While at the scene, Officer Aiu encountered and spoke with Ah Loo. Officer Aiu observed that "there was a hole consistent with what might possibly be a gun shot" "in the front windshield driver's side" of the blue van. Based on what he had learned from Ah Loo, what he had seen of the blue van's condition, and what Antonio had said in his presence, Officer Aiu "placed [Antonio] under arrest for attempted murder."

During the investigation that ensued, Officer Aiu became aware that the police were looking for Kekona. On January 26, 2006, Officer Aiu, along with officers from the Specialized Services Division, went to an apart-

dent. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

ment at the Pearlridge Gardens and Tower to arrest Kekona. At the apartment, they found Kekona but did not find any firearm, ammunition, or gun case.

### b. *Douglas Lee*

HPD Officer Douglas Lee (Officer Lee) testified that on the evening of December 27, 2005, he heard, via his police radio, "that a shooting had just occurred at the ... Pearl City City Mill, and that [Ah Loo] was calling and saying that the suspect shot at him and the bullet hit his dashboard.... [Ah Loo] was in his vehicle following the suspect who was a front seat passenger in another vehicle." Officer Lee testified that at the intersection of Kalaloa Street and Okekani Loop near Halawa Housing, he saw his partner's blue-and-white vehicle "nose-to-nose" with the purple car. Behind the purple car was a van, and behind the van was another van, a blue Dodge. Officer Lee got out of his car and "observed a female who was frantic, very animated, screaming, and another male ... later identified to me as [Ah Loo]. He was also very animated." Officer Lee stated that Ah Loo related that a shooting had occurred, "the shooter was the front seat passenger of that purple vehicle that was stopped[,]" and the shooter had fled through the parking area of the Halawa Community Center. Ah Loo also described the shooter. Officer Lee stated that he immediately relayed the information received from Ah Loo "to other responding units via the police radio" and thereafter canvassed Halawa Housing looking for residents who might have seen the shooter.

Officer Lee further testified that he was later told by Officer Aiu that Antonio had claimed to be the shooter. Based on this information, he "placed brown paper bags over both [Antonio's] hands and secured them with rubber bands" to "preserve any evidence that might be on her fingers." Officer Lee explained that "[w]hen someone fires a firearm, there is trace amounts of gunpowder residue on their hands. And we try and preserve that so that when the Scientific Investigation Section comes out, they conduct a ... gun shot [sic] residue test to determine if that person in fact has recently

fired a firearm." Officer Lee also stated that he arrested Antonio that evening.

### c. *Kaleo Kaluhiokalani*

Kaleo Kaluhiokalani, a criminalist with the Scientific Investigation Section of HPD, testified that he conducted a gunshot-residue analysis of Antonio's hands and concluded that Antonio "either discharged the firearm, was in the near vicinity of a firearm that was discharged, or came into contact with an object that was contaminated with gun shot [sic] residue."

### d. *Stephanie Kamakana*

Stephanie Kamakana, a fingerprint-identification technician with HPD, testified that she was asked to conduct a comparison of some latent fingerprints that were recovered from the purple car with fingerprints contained in the Automated Fingerprint Identification System database. Based on the comparison, she identified the latent fingerprints as belonging to Kekona.

### e. *Erick Yokomori*

Erick Yokomori (Yokomori) testified that he went to the Waimalu Shopping Plaza on December 27, 2005 just before 7 p.m. to buy a pack of cigarettes at the Gourmet Liquors store. The sun was down, but there was overhead lighting in the parking lot. Yokomori related that after purchasing the cigarettes, he went outside the store and prepared to have a cigarette. While standing outside the store, he "saw two cars coming down one of the parking lanes going much faster than they should have been. [He] saw then the first car make a right turn and hit this pole." According to Yokomori, the first car looked like "a Saturn.... A regular four door or two door—like a sedan[,]" and the second car looked like an SUV and was "much bigger" than the first car. The distance between these two cars "was close[,]" approximately six to eight feet apart.

Yokomori recalled that as the first car headed toward him, "it looked like it was turning right" and then "[i]t struck the concrete block that holds the light pole." Yokomori then "saw the second car hit the back of the first car.... It was like a—like a tap.

They tapped the back of the first car." The second car then "reversed from the first car, and a man got out on the passenger's side of the first car." The man "walked over towards the front of the second car. And he had a gun. He raised it up and he shot at— toward the windshield." The man was between one and one-and-a-half car lengths away from the second car when he shot the gun. Yokomori recalled that the driver of the first car was a woman, who screamed when she struck the pole. According to Yokomori, after the gun was fired, he went back into Gourmet Liquors and asked the clerk to call the police. Approximately six minutes elapsed from the time he first saw the cars coming down the aisle until he saw the cars leave.

On cross-examination, Yokomori mentioned that what drew his attention to the two cars was their sound and the fact that they were "coming down the aisle at a rapid—higher rate of speed than [he] would have expected for the area." He thought he was looking at some type of road rage type of situation and "that possibly the car that was in the front had maybe took a parking or had cut somebody off and was being chased by the second car." Yokomori acknowledged thinking that somebody in the second car was "angry at the person in the front [car.]" He also agreed that because the second car was traveling so close to the first car and both cars were speeding, it was not surprising that if there was any sudden stop by the first car, the second car would not be able to stop in time and there would be a collision. Yokomori recalled that after the first car struck the light pole, the first car was momentarily pinned in by the second car: "Once [the first car] hit the pole, it stayed there." Explaining the "tap" of the first car by the second car, Yokomori stated: "Well, it's hard to describe but, you know, it was hard enough that it made a noise but not hard enough to leave any damage on the car."

Yokomori stated that the shooter fired one shot at the second car and nothing "impeded the shooter from approaching the second vehicle[.]" The shooter "could have walked up to the window" of the second car. Yokomori also testified that after going back into Gourmet Liquors to have the people there call for help, he looked out through the window and saw the two vehicles leaving.

#### f. *Gary Lahens*

Gary Lahens, a detective with HPD (Detective Lahens), testified that he was the lead investigator for this case. Detective Lahens took a statement from Antonio on December 28, 2005. Detective Lahens also interviewed the children of Antonio and Ah Loo.

Detective Lahens explained that once the investigation determined that Antonio was not the shooter, she was released. Detective Lahens testified that when Antonio was released, he gave her instructions to tell Kekona to turn himself in, "[a]nd if she didn't, she would be getting herself involved as far as hindering him or hiding him." Detective Lahens interviewed Kekona after arresting Kekona.

Detective Lahens became aware, based on his interviews with Ah Loo, Ah Loo's daughters, and Kekona, that a shot had been fired at Ah Loo's van. A bullet was subsequently recovered from Ah Loo's van.

On cross-examination, defense counsel showed to Detective Lahens photographs taken on the night of the incident, which revealed that the hood of Ah Loo's van was pushed upward and "crinkled open[.]" Detective Lahens did not recall seeing that damage and could not explain why Ah Loo's van would have such damage when the back bumper of Antonio's car had only scratch marks. Detective Lahens was also not aware that Ah Loo had repaired his van immediately after the investigation.

#### g. *Ah Loo*

Ah Loo testified that he and Antonio were in a relationship for fourteen years from 1991 to 2005. They had three children together, and Antonio had one child from a previous relationship whom Ah Loo considered to be his daughter. According to Ah Loo, Antonio left the house on December 14, 2005 and did not return.

Ah Loo testified that on December 27, 2005, he went to Blaisdell Park with his three

biological children and, while in the parking lot, he saw Antonio's car headed in the ʻEwa direction on Kamehameha Highway. He and the children got into his van and went to look for Antonio's car. He drove out of Blaisdell Park and headed ʻEwa on Kamehameha Highway. Ah Loo did not see where Antonio's car went but assumed she turned left onto Kaluamoi Street because she was familiar with that street. He, therefore, made a left turn onto Kaluamoi Street, and as he drove toward the dead end on Kaluamoi Street, he saw Antonio's car heading toward his van.

Ah Loo testified that as he passed Antonio's car, he saw "[Antonio] and three males" inside the car. He did not recognize any of the men. Ah Loo then "[m]ade a U-turn and . . . followed her." Ah Loo testified that his van and Antonio's car collided about fifty yards before the intersection of Kaluamoi Street and Kamehameha Highway. The following colloquy then ensued:

Q. . . . How is it that your van touched the Eagle Vision?

A. I didn't expect her to hit her brakes that soon. I just didn't respond on time.

Q. Okay. So to be clear then, as you made your way out, did you speed up to catch up to the van—I mean, the Eagle Vision sedan, continue at your normal—your initial speed? How is it that you got up so close to her that you could have even made contact?

A. Well, I was going—I was probably going maybe normal speed or little bit faster.

Q. Which was approximately what speed?

A. Maybe around 30.

. . . .

Q. . . . so to be clear, you're driving along Kaluamoi towards where it dead ends; right?

A. Uh-huh.

Q. She was driving in the other direction, right?

A. (Witness nods head up and down.)

Q. Right?

A. (Witness nods head up and down.)

Q. You had to make a U-turn; right?

A. Uh-huh.

Q. Would it be fair to say that there was some distance between your car and her car by the time you made the U-turn?

A. Yeah.

Q. At what point along Kaluamoi were you—had you closed the distance on her?

A. I'm not exactly sure, but it would probably be somewhere around this back area still yet.

Q. Now going back to the area just 50 yards makai of the intersection of Kamehameha Highway and Kaluamoi, how was it that your car touched her car? I mean what were the circumstances? Did you go up and ram it?

A. No.

Q. Explain to the jury what happened.

A. She just hit her brakes, and I was—I was just close to her at that time. And she hit her brakes, and I didn't hit mine.

Q. About how close had you been following before she hit her brakes?

A. Maybe half a car length.

Q. Were you trying to hit her car?

A. No.

Ah Loo explained that he followed Antonio as she made a right turn onto Kamehameha Highway. Thereafter, he said, "We took a left on Hekaha [Street]," which connects with Moanalua Road, made a left onto Moanalua Road, "headed back [ʻEwa] direction, and we entered the Waimalu Shopping Plaza." Ah Loo denied that his van touched Antonio's car anywhere between the time his van first touched Antonio's car and the time they entered the Waimalu Shopping Plaza. Ah Loo related that when he followed Antonio's car into the parking lot of the Waimalu Shopping Plaza, his van and Antonio's car collided. The following colloquy then ensued:

Q. Could you explain to the jurors how that happened?

A. Same way. She hit her brakes.

Q. What happened next, [Ah Loo]?

A. I stopped. Her car continued to—she rolled forward. The passenger got out.

. . . .

... The front passenger got out and basically fired the gun at us.

Q. Did you see the front passenger get out of the car?

A. Yeah.

Q. At this point where are your daughters?

A. The one in the front seat, two in the back.

. . . .

Q. The person who got out of the front passenger [sic], male or female?

A. Male.

Q. Describe his movements.

A. It was quick. Just got out, yelled something, and got back in—fired the gun, and he got back in.

Q. Where was he in relationship to your van when he fired the gun? Directly in front of you, to your right, to your left?

A. Front diagonal right.

Q. So you're looking out the front seat of your—well, let me rephrase the question. Did you see him get out of the car?

A. Yeah.

Q. Did you see him approach the van?

A. No.

Q. What happened next?

A. He just fired the gun.

Q. How do you know he fired the gun?

A. I seen a gun and I heard a shot.

Ah Loo testified that right after the shot was fired, Antonio got out of the car. Thereafter, Antonio and the shooter both got back into the car, "[t]he two back seat passengers got out of their car, and [Ah Loo] called 911."

Ah Loo stated that after Antonio and the shooter got back into the car, he followed them. They got back onto Kamehameha Highway, headed toward the stadium, and ended up in Hālawa. Ah Loo then saw Kekona get out of Antonio's car. Antonio drove away, and Ah Loo followed her around the stadium. The police caught up to Ah Loo and Antonio in the area of Kalaloa Street and Ohekane Loop.

On cross-examination, Ah Loo testified that when he was shot at by Kekona, Kekona was "[r]oughly two car lengths" away. The following dialogue then occurred:

Q. Okay. Isn't it true that what happened was you saw the gun, the gun made you scared, and you ducked and then he shot?

A. No. It was more of a one continuous motion.

Q. Okay. Because you wrote a statement for police in connection with this case; is that correct?

A. Yeah.

Q. And the statement that you prepared for the police, when I said you wrote it, you actually wrote it. That was your handwriting?

A. Yeah.

. . . .

Q. ... Is it fair to say that your memory of what had happened at the time of the shooting would have been better back on December 27th about an hour after the incident than it would be today?

A. I would say that's fair to say.

Q. Okay. Now isn't it true that in the statement you prepared to police you wrote, and I quote, the front passenger got out and pulled a gun, comma, I ducked, and he shot. Okay. Now you wrote that?

A. Uh-huh. I'm not sure if I wrote it, but—

Q. Would you like to see if you did. Because in all fairness to you, like you said, you're not sure what you wrote and it was written some time ago. Would you like to see it to make sure it's accurate?

A. I'll trust that you're honest.

[DEFENSE COUNSEL]: Thank you.

All right. But, you know, maybe you shouldn't do that; right? I mean maybe the best thing to do is take a look at it and say it's there or not. Okay.

With the court's permission.

THE COURT: Yes.

Q. (By Defense Counsel) And I meant no disrespect when I said you shouldn't do that because I appreciate what you said. Okay. But it's for the record.

A. Right.

Q. And so, for the record, after having examined the statement that you wrote, does it say what I quoted to you?

A. Yeah.

Q. Okay. Now is that what happened? He pulled the gun, you ducked, then he shot?

A. Yeah. I was more—it was just like one continuous motion.

Q. Because I take it that from a distance, maybe a couple car lengths away, you would agree with me that you would not have been able to—you wouldn't be faster than the bullet?

A. No, I don't think I would be.

Q. You would have to be down before the gun was shot; is that correct?

A. What you mean? To get missed?

Q. Well, you see the gun. You see the gun come up. Wasn't your normal reaction, natural reaction just to go down before in one continuous moment or one continuous movement I should say as you're hearing the shot, as you're going down? You went down almost before it was shot but you felt like it was at the same time?

A. No. It was just—everything just happened so fast. As soon as he pulled it out, he didn't hesitate.

Q. So he pulled it out. And neither did you; is that correct? He pulls it out, and you go down, and you hear "boom"? Is that how it happened?

A. I don't think I went down before the shot went off.

Q. But you just wrote that, but you don't think—

A. Because it happened so fast. I don't think I recognized the gun that quickly—

Q. Okay. You could have written—

A—until it was shot.

Q. I'm sorry. You could have written "He pulled a gun out, shot, and I ducked"? Correct? You see the difference?

A. I could have, yeah.

On further cross-examination, Ah Loo explained that he went chasing after Antonio's car after his van had been shot at because he "wanted them caught." He didn't believe he was putting his children, who were in the van, in grave danger by chasing Antonio's car because he kept his distance and if things "got that bad, [he] would have stopped." Ah Loo also admitted that the December 27, 2005 collisions with Antonio's car were not the first time he had collided with Antonio's car. However, he insisted that it was Antonio's car that had hit his vehicle before.

The State rested its case following Ah Loo's testimony.

### 2. The Defense Witnesses

Prior to the presentation of the defense witnesses, Kekona's trial counsel made an offer of proof that Kishanne Ah Loo (Kishanne) and Shailanne Ah Loo (Shailanne), daughters of Ah Loo and Antonio, were outside the courtroom and prepared to testify that "they have seen many prior occasions before December 27th of 2005 when [Ah Loo] had beaten [Antonio]." Trial counsel explained that Kishanne "would testify specifically that [Ah Loo] would hit [Antonio] the way a man would hit another man, and she would go into, if permitted, details about punching and hair pulling and kicking." Also, Shailanne would testify "that prior to December 27th of 2005, like her sister, Kishanne, she had personally witnessed occasions where [Ah Loo] beat [Antonio], which included punching, hair pulling, and kicking." Defense counsel further stated:

> And our position is that this testimony would—if allowed into evidence, would be relevant to corroborate [Kekona's] belief that it was, in fact, reasonable. As the Court is aware, I did inform the Court that [Kekona] was only informed by [Antonio] specifically, the specifics of what happened to her, on December 14th. In general, she told him that there had been other occasions where [Ah Loo] had beaten her, kicked her over jealousy, and—but she did not specify the dates. The children are too young to remember the dates, though they could not give the Court that, but they could give the Court they would say numerous times, many times. That is what they would testify to.

We believe that such testimony is relevant to corroborate the reasonableness of

[Kekona's] belief, that although he did not have specific knowledge of the specific instances, he had a general knowledge, and their testimony would tend to prove that that general knowledge was reasonable.

We also would submit that such evidence is admissable [sic] to the credibility of—to cast doubts on the credibility of [Ah Loo], 'cause at least it would show a dislike for [Antonio] or, in the alternative, a desire on his part to control [Antonio], which would be relevant to one of the issues in this case, which is specifically why was [Antonio] trying so hard to get away from [Ah Loo] on the date in question.

The circuit court denied "presentation with respect to evidence of the acts on unspecified doubts." The defense then presented its witnesses.

### a. *Kishanne*

Kishanne, who was eleven years old at the time of the trial, testified that on the day the shooting occurred, she was at a park with Ah Loo and her sisters Shailanne and Jiordanna. After she saw a car pass by that looked like a car Antonio used to drive, Kishanne, her sisters, and Ah Loo suddenly got back into the van and followed the car. The van had no backseats, and Kishanne sat in the middle of the floor in the back of the van. Ah Loo was driving the van.

Kishanne testified that they exited the park and turned left toward Wai'anae. Ah Loo then "turned down the L & L road, and then we drove all the way back over here, and then that's when we saw [Antonio]" coming from the opposite direction. Kishanne stated that after seeing Antonio, "[w]e turned" and "then we sped up the road" to follow the car. Kishanne then explained what happened at the intersection next to the L & L Drive–Inn:

A. Okay. [Antonio], she stopped over here at the line where you supposed to stop to see if the cars are coming, right, and then [Ah Loo] came and then, like, he I think—he banged the car, the back of [Antonio's] car, and then, like, she was surprised or something—

Q. Okay.

A. —'cause I could see her looking back.

Q. She was surprised, you said?

A. Yeah. 'Cause like her face when she—

Q. Okay. Now, let me ask you something. You said [Ah Loo] hit [Antonio's] car—

A. (Nods head.)

Q. —by the L & L, close to the main road, this is Kamehameha Highway. Was [Antonio's] car—what happened to [Antonio's] car when [Ah Loo's] car hit [Antonio's] car?

A. It went over this line and went over the part where the cars come—where the cars can collide with the cars coming.

Q. So if had cars coming, from what you could tell, the cars would've hit [Antonio's] car?

A. Yeah, they were like the—the ... like the hood part.

Q. The hood part of [Antonio's] car?

A. Yeah.

Q. Now, you said you was on the floor, though, of the van, how was it that you could see this part?

A. I was on my knees 'cause I stood up to see what happened because ...

. . . .

Q. . . . . From what you could tell, could you tell if [Ah Loo] drove fast right before he hit the car or slow? Was [Ah Loo] driving too fast from what you could tell?

A. Yeah, to, like, catch up with [Antonio] before she made the turn.

Q. And he hit her car into the road?

A. Yeah. Not the first time. And then the second time he was trying to, like, push her out to the road.

Q. Okay. Let me stop you there. You said after the first time he hit her, there was a second time he was pushing her in the road.

A. (Nods head.)

Q. You have to say "yes" or "no."

A. Yes.

Q. Okay. Now, is this the first—now you can go sit down, please.

Is this the first time you ever been in a car where [Ah Loo] rammed [Antonio's] car?

A. No.

Q. Has it happened before?

A. Yes.

Q. And if you can tell the jury, whose car are you in when [Ah Loo's] car hits [Antonio's] car?

A. [Antonio's].

Q. And who else is in the car with yourself besides you and [Antonio]?

A. My other three sisters, Taishanne, Shailanne, and Jiordanne.

Q. Okay. Now, coming back—sorry to jump around, but this is not the first then, huh?

A. No.

Q. When [Ah Loo] hit [Antonio's] car and was pushing her out in the traffic, how were you feeling inside?

A. Like the—the—

Q. At the L & L, you know when [Ah Loo's] car was pushing [Antonio's] car?

A. Yeah.

Q. How were you feeling inside?

A. Scared, because, like, it's not usual for that to happen. It's like . . .

(Some ellipses in original.) Kishanne explained that after Ah Loo tried to push Antonio's car into traffic, Antonio turned left in the Wai'anae direction, and Ah Loo followed. Antonio then "made a U-turn on one of these U-turn places" on the main road and headed back toward Honolulu. Kishanne felt scared and felt like they were going too fast. The following colloquy between defense counsel and Kishanne ensued:

Q. Okay. As you're—how long did [Ah Loo] end up—you know, eventually you folks came to Waimalu Shopping Center. Do you where that place is?

A. Yes.

Q. Did you folks get there fast or was there a long chase?

A. I don't remember. All I remember is that, like, it started, like, afternoon when the sun was about to go down, and we ended up at Waimalu Shopping Center when it was dark.

Q. Okay. Now, as [Ah Loo] is going after [Antonio's] car, what's happening to you and Jiordanne in the back?

A. We, like, flying all over the place. Like, my sister, Jiordanne, got hurt by her—like her shoulder was hurting after that, and then . . . yeah.

Q. Okay. Do you remember a point in the chase when [Antonio's] car drove in a circle? Do you remember something like that?

A. No, but I can remember getting tossed all over.

(Ellipsis in original.)

Kishanne stated that when they reached the Waimalu Shopping Plaza, someone shot at Ah Loo's van. Thereafter, Ah Loo continued to follow Antonio's car. When Antonio went down a road and made a U-turn, Antonio made a U-turn, too. There was lots of turning. Kishanne said that after passing "Forty Niners," Antonio "was going to go into the town and then, like, she decided to, like, go towards Halawa [Hālawa] part[.]" According to Kishanne, "[w]e were, like, following her and, like, it came to that part, but then there's no barrels, the circular barrels, right, and then we, like, almost hit the front one or something" and almost got into an accident.

Kishanne testified that after the events of the evening, Ah Loo "told [her] to tell [the police] that we weren't speeding and then, like, we only hit [Antonio's] back of her car, like, once or twice, and then, like—that's all I can remember. That's all that I can remember him telling us to say."

On cross-examination, the following dialogue took place:

Q. And you've been living with [Antonio] for a few months now, right?

A. Yup.

Q. Back in December of 2005, there was a time when you and [Ah Loo] and your sisters, Shailanne and Jiordanne, were living at 871 Ho'omoana Street, correct?

A. Yup.

Q. And there also came a time when [Antonio] wasn't living in the house, right?

A. Yes.

Q. And, in fact, you were just living with [Ah Loo] at the time, right?

A. Yup.

Q. And on the date of the shooting, [Antonio] wasn't living in the house; is that correct?

A. Yes.

Q. And it's true that for weeks after the day of the shooting, [Antonio] wasn't living in the house, correct?

A. Yes.

Q. And, in fact, [Antonio] wasn't living in the house for months after the shooting, correct?

A. Yeah.

Q. And you know that [Antonio] got into trouble because of this incident, right?

A. Yeah.

Q. And, in fact, [Antonio] told you that she had gotten into trouble, right?

A. Yeah.

Thereafter, the deputy prosecutor sought to impeach Kishanne's trial testimony:

Q. Now, you told [Defense Counsel] that [Ah Loo] turned around and sped up to catch [Antonio], you remember saying that?

A. Yes.

Q. You know when you talked to Detective Lahens on December 28th, the day after this happened, at any time did you tell Detective Lahens that [Ah Loo] sped up to catch [Antonio]?

A. In the interview?

Q. Yeah.

A. No.

Q. All right.

A. 'Cause he didn't ask.

Q. Okay. Now, you said that at this intersection, [Ah Loo] hit [Antonio's] car, right?

A. Yeah.

Q. And you said that [Ah Loo] pushed [Antonio] out into the—this road over here, right?

A. Yup.

Q. At any time during your interview with Detective Lahens, did you ever tell him about this incident here by the L & L?

A. No, 'cause he didn't ask that either I think. I don't think he asked about it.

Q. And you told us today that [Ah Loo] supposedly pushed [Antonio] out into the roadway here, right?

A. Yeah.

Q. Remember saying that a little earlier?

A. Yeah.

Q. But you never told Detective Lahens that, did you?

A. No.

Q. Now, you told us that while [Ah Loo] had rammed [Antonio] before with—while you were in the car, do you remember telling us that a little earlier this afternoon?

A. Yeah.

Q. And on your interview with Detective Lahens, the day after the shooting, you never told the detective that this had happened, right?

A. Yeah, because he didn't ask.

Q. You also said that after this intersection, [Antonio] made a left going in this direction towards Pearl City or Waianae [Wai'anae], right?

A. Yeah.

Q. And then—but you never told Detective Lahens that either, though, did you?

A. No.

Q. And then you told us earlier that—later, afterwards, [Antonio] was going towards Waianae [Wai'anae], then she made a U-turn and started going back towards Honolulu, right?

A. Yup.

Q. But you didn't tell Detective Lahens that either, right?

A. Yup.

Q. You also said that—well, your sister, was it Jiordanne, was hurt in the back of the van?

A. Yeah, 'cause her shoulder was hurt.

Q. Okay.

A. Her shoulder was hurting after like—after the whole incident.

Q. The whole incident?

A. Yeah.

Q. Did you ever tell Detective Lahens that your sister got hurt in this incident?

A. No, because he didn't ask that either. He didn't ask if anybody got hurt, so I wouldn't say it.

### b. *Kekona*

Kekona testified that he and Antonio first met in 1999 or 2000 when he worked for his uncle's towing business. He towed wrecked cars and did body and fender work to repair the cars. Antonio installed stereo systems for Kekona's in-laws and uncle and also "installed accessories, like after-market parts, lights, racing kind stuff." Kekona stated that Antonio "was good for one girl" and she "spent a lot of time over the house, always fixing cars." She was around so much that she became almost like family. Kekona remembered that at the time, Antonio had her own company, which was named "Sargent and Tammy's Accessories or something like that."

Kekona testified that on December 14, 2005, he was at Aiea Cue, shooting pool, when he saw Antonio coming out of the restroom; it was the first time he had seen her in four or five years. Kekona said that he yelled Antonio's name. He then explained what transpired thereafter.

A. . . . I was like[, Antonio], and then she—you know, she kinda jerked like, you know, like she was scared, like shocked kind somebody goin' yell her name like that. So, you know, when I looked at her, it was like I could tell, you know, something was wrong.

Q. And why do you say that?

A. Because you know when somebody's like scared or—or something like that, or hiding, like that's how [Antonio] was acting at the game room, you know what I mean, like usually if we're out there, you just cruising.

Q. Well, what was she doing? What kind of specific behaviors that you can recall?

A. She was looking out the window, 'cause we were on the second level at the Aiea Cue, so she kept looking out the window and looking who's coming up through the front door, the steps like that. I was just tripping out on her. I asked her, [Antonio], what's the matter, something wrong? She's like, oh, no, no, no, you know. So, you know, I was like, wow, I never see you for a long time, . . . what's going on? She tells me that, you know, same thing, you know, her and Sarg, you know—

Q. Well, let me rephrase that—let me ask you a question. Do you see her acting strange?

A. Right.

Q. You ask her why she acting that way?

A. Yeah.

Q. What does she tell you eventually?

A. She didn't say Sarg's name, she said her boyfriend, her and her boyfriend, same thing, he jealous you know the kind, he accusing her of—I cannot say what she said exactly.

Q. Well, what did she—what words did she say to you when she was explaining why she was acting that way?

A. She said Sarg—Sarg thinks I fucking everybody and—and, you know, whoever she with, like that, he always punking them. Like the last—just recent kind, you know what I mean, like whoever was near her car, he think already that person or whoever [Antonio] talk to is messing with [Antonio], yeah?

Q. Did he ever connect what that had to do with how you saw her acting on the 14th?

A. Yeah. Well, she just told me, yeah, he still kicking my ass, that's what she said, and then—

[Deputy Prosecutor]: Objection, Your Honor.

THE COURT: Sustained.

Kekona further testified that he noticed scratch marks on Antonio's neck and other bruises on Antonio. Kekona told Antonio that if she needed anything, he would help

her. He gave Antonio the number to his home in Kalihi.

Kekona stated that about three days later, Antonio called and asked if his offer was still good. When he said, "[Y]eah[,]" she asked if he could hurry up and pick her up from Aiea Cue. When he picked up Antonio, he noticed that her "behavior was a little bit worse than it was the night when [he] first saw her, because she didn't have her car at that time."

A. Yeah, her car was hiding down the street somewhere, and she assumed that her boyfriend was watching the car.

Q. All right. But what was she behaving like when—that was odd?

A. She was, yeah, just hiding, you know, looking out the window, watching all around her. And I was like, you know what, let's just leave already, you know what I mean? So when we walked out of the Cue, we went downstairs. Before she walked out of the hallway, she was like checking the parking lot, checking the street. When we got to the car, she jumped in the car, and the first thing she did was lay the seat back in the car, you know what I mean?

Q. No, what do you mean?

A. Like she laid—soon as she get in the car, she closes the car, lay the seats all the way back like she's lying down in the car, like hiding.

Q. What do you say when you see this, what's your reaction?

A. I was trying to, you know, not make her trip, so I was like, you know what, sit up, what's the matter, no need hide, you know what I mean? And she was like no, just go, just go, just go, you know da kine.

Kekona testified that Antonio relaxed once they got to his home in Kalihi. Antonio then told Kekona that she and Ah Loo had gotten into an argument on December 14, 2005, accused each other of "fooling around," and Ah Loo ended up "punching her in the head and choking her." Antonio showed Kekona the marks on her neck and let him feel the lumps on her head. Antonio continued to stay with Kekona and they eventually became boyfriend and girlfriend.

Kekona testified that on the afternoon of December 27, 2005, Antonio came back to the house in her car and picked up him and a couple of his friends, Henry Denton (Denton) and Kenneth Kaualoku (Kaualoku). Kekona sat in the front-passenger seat, Denton sat in the back seat behind Antonio, and Kaualoku sat in the back seat behind Kekona. At about 6 p.m., Antonio drove past Blaisdell Park on Kamehameha Highway in the 'Ewa direction, then turned left onto Kaluamoi Street "to go check out some of [Kekona's] friends that live [there]." It was almost evening, "so this whole street is all cars now, there's not just only these cars, there's cars all the way." Kekona's friends were not home, so Antonio turned the car around in the cul-de-sac and drove back toward Kamehameha Highway. As Antonio drove down the road, Kekona saw a blue van heading toward them. Kekona testified:

A. At first I never know it was one blue van, I just seen one car coming, right, and then so I looked at it. And I never notice the reaction on [Antonio's] face. But we—we started to proceed, and I seen the van coming, too, and you no can squeeze two cars, you know what I mean, between there, it's hard, 'cause this lane was really narrow, you know what I mean?

Q. So what is the custom under the circumstances?

A. You let one car—if you can pull on the side, that person that can pull on the side can go. And like this part of the street right here is open, the cars only come down here, yeah, so he could have pulled here, and we was about here already, he could have pulled over here and let us through.

Q. So would've been easier for him to give way than [Antonio]?

A. Yeah.

Q. So what happened?

A. We just continued up to him until we was right next to the van, and then we—I was like, wow, this guy nuts, you know what I mean?

Q. Why do you say that?

A. Because he trying to squeeze in two cars in that place like that. The way we was next to him like that, I can touch his—

if I'm in the driver's seat, I can touch his van, I can touch his door, or touch him, that's how close we are in the lane.

Q. Okay. Do you notice something about his body positioned in the—

A. Yeah, he—he was leaning out the window. And he kinda higher than us in the van, so he's leaning out the window looking down at us with, like, one mad face. I thinking, oh, this guy nuts, you know what I mean? He the one come through the lane. I—I thinking the whole time that this is over coming through the lane, we never give him the right of way for come through, you know da kine. And, you know, he just looking at us. I say punking, 'cause that's the look he had, like one mad look, you know da kine. He just looking down at us and looking at [Antonio]. Then he looks at me and he looks at the guys in the back seat. All the while [Antonio] doesn't stop, we just keep moving past him. . . .

After Antonio passed the blue van, Kekona recalled,

she starts flying this way and we whip around this turn over here. There's a stop sign here; we no stop, she just takes the turn. And then right there I said what the hell's going on[, Antonio], you know what I mean?. And she's like—when I told her what the hell going on, you know what I mean, slow down 'cause we in one neighborhood, you know what I mean, and she's like, no, that's him, that's him, that's Sargent. . . .

Kekona said he told Antonio to slow down or pull over because he knew the neighborhood, had a lot of friends living there, and there were a lot of kids. He also told Antonio that there were "three of [them]" in the car and they would not let Ah Loo do anything to her. However, Antonio refused to stop and took off. At the intersection of Kaluamoi Street and Kamehameha Highway, Antonio came to a stop. There was a wave of cars passing in front of them. There was also a blind spot which made it difficult to see if there was oncoming traffic. Kekona testified that he and Antonio were both "leaning out so [he] can tell her when to go" and were inching their way over, when "poom, we get whacked from the back. We end up flying out little bit past the line, and then next thing you know [we heard] tires, you know da kine, like he's behind us pushing us, and [Antonio's] holding on the brake[.]" Kekona said that he, Denton, and Kaualoku were "tripping," and he was telling Antonio to pull the car over " 'cause we goin' get killed[.]" When there was a break in the traffic, Antonio entered Kamehameha Highway going westbound; the van was right behind them. Antonio then "whipped [a] U-turn," and the blue van turned with them. Antonio and the blue van were going "at least 60 to 70 miles per hour[.]"

The blue van continued to follow Antonio's car as they proceeded eastbound. When Antonio was slowed by traffic at a stoplight, the blue van continually bumped Antonio's car. Kekona described the wild ride that Antonio took them on and stated that when Antonio turned into the Waimalu Shopping Plaza, they got "whacked again from the back[.]" Antonio then hit the brakes to avoid "clean[ing] out the cars stopping for the cars that's turning in [there,]" and at that time, numerous bottles and a "triangle bag" slid out from under the driver's seat. According to Kekona, he looked at the bag, and Antonio looked at him and "said don't touch 'em, I goin' shoot 'em, I goin' shoot 'em." Kekona then grabbed the bag from Antonio and felt a gun inside the bag.

Kekona testified that as a convicted felon, he knew that he was not supposed to possess a firearm and if he had known there was a gun in the car, he would have tried to get Antonio to stop the car when her car first got hit. He grabbed the gun because it "[w]as either that or, you know what I mean, if we keep whacking us, if we keep running, the way [Antonio was] driving and the way [Ah Loo was] banging us like that, I no like get killed, or my friends, get two in the back never know what was going on. We goin' end up getting hurt or something." Kekona explained that when the gun first slipped out from under the seat, he did not need to use the gun because Antonio's car was almost at the entrance to Waimalu Shopping Plaza, where they were headed because there was a police substation there. However, when they

got to the parking lot, there were "no cop cars over [there.]" Kekona testified that as Antonio was driving down the lane into the shopping plaza, the blue van hit Antonio's car from behind and pushed it into a light post. At this point, the blue van was directly behind Antonio's car.

According to Kekona, the blue van then began to reverse, causing Antonio's car to move away from the light post; he then got out of the car with the gun in his hand. Kekona stated that he didn't stay in Antonio's car because he didn't know if [Ah Loo] "was goin' ram us again. . . . Plus, too, I get my friends in the car[.]" Kekona wasn't sure if the blue van was going to hit the back of Antonio's car again. Kekona then walked toward the back of the trunk of Antonio's car and held the gun out at chest level so Ah Loo could see the gun. The blue van then began to move forward and Kekona put the gun up. When Kekona put the gun up, the driver ducked down to his right, below the dashboard. Kekona wasn't sure if the driver was hiding from Kekona's gun or went to grab his own gun. Kekona then thought to himself:

> [T]his guy was crazy enough for bang us all the way, you know what I mean, and do all that kind stuff. I don't know if he get one weapon, you know da kine, or anything in the car. What if he had his own gun, you know what I mean, what I goin' do, wait for him come up and shoot me first?

Kekona then shot in the direction from where the driver had moved. Kekona claimed he was aiming for the hood. His purpose in firing in that direction was to scare, not kill, the driver "so pau [5] already, so he no chase us, you know what I mean?" Denton and Kaualoku got out of the car after Kekona shot the gun.

Kekona and Antonio got back into their car, and Antonio backed away from the light pole and drove away. The blue van followed, and another high-speed chase ensued. Antonio attempted to "shake" the blue van with some "crazy" moves, and she stopped the car at Halawa Housing after it appeared that the van was gone. Kekona got out of the car and continued to talk to Antonio. As Kekona and Antonio were talking, the blue van came around the corner toward them. According to Kekona, as soon as the van turned the corner, Antonio drove away. "The door wasn't even shut and [she] just took off." Kekona then ran across the street and the blue van chased Antonio.

Kekona explained that the reason he did not give himself up to police right away was because Antonio had been communicating by phone with Ah Loo and trying to get Ah Loo to "make things good" and "go to the cops and stuff" and tell them what had happened on the evening in question. Ah Loo indicated that "the only way he was going to go do that and try make things good is that he wanted—he wanted [Antonio] back."

Kekona stated that he was aware that Antonio had told the police that she shot at Ah Loo. He was also aware that Antonio was arrested on December 27, 2005 and released a couple of days later. Kekona admitted staying with Antonio after she was released. He also realized that the police were asking Antonio for information regarding Kekona's whereabouts and that Antonio did not tell them Kekona's location. Kekona was arrested on January 26, 2006.

### C. The Prosecution's Closing Argument

During closing argument, the prosecution made several statements which are at issue in this appeal.

First, the prosecution argued: "[Kekona] alleges that [Antonio] told him on December 14th, 2005 that [Antonio] said that [Ah Loo] punched and choked her. Where's the independent proof of that?" Kekona's attorney objected to this statement, and, during a bench conference, requested that the circuit court grant a mistrial on grounds that the prosecution knew why the defense could not call Antonio. First, there was a danger that certain evidence might be admitted. Second, the defense would need the permission of Antonio's counsel to call Antonio. And third, defense counsel was precluded from presenting the objective independent proof, which would have been through Antonio and Ah

---

5. The Hawaiian word "pau" means "[f]inished, ended, through, terminated, completed, over, all done[.]" M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 319 (1986).

Loo's daughters, that Ah Loo had beaten Antonio in the past. The circuit court denied the motion for mistrial, sustained the objection, struck the statement, and instructed the jury to disregard it.

Second, in explaining why the protection-of-others defense did not apply, the prosecution argued to the jury: "[T]he defense would have you believe that, well, [Kekona] was reasonable in his belief that he had to protect [Antonio], [Kaualoku,] or [Denton]. The fact of the matter is the names Kenneth Kaualoko [sic] and Henry Denton only exist because [Kekona] told you so." During a bench conference, Kekona's attorney stated that such statement was prosecutorial misconduct because "[t]he prosecutor himself knows that these people exist" because the prosecution provided the defense with Denton's and Kaualoko's [sic] criminal records. "So to suggest that—the prosecution—we're making these people up, when the prosecution knows is misconduct." The following colloquy then ensued at the bench:

[DEPUTY PROSECUTOR]: That's completely incorrect. When I was trying to cross-examine [Kekona] whether or not these people existed, the Court cut me off, there was no proof that these people existed. If you recall the proffer, I asked how do I know the people? By obtaining criminal records. I don't know who these people are. The first time I heard the name Henry Denton was in the defense's opening statement. There's no proof that these people even exist other than what [Kekona] said. The prosecution doesn't know for sure. I don't even know where these people are. When I asked [Kekona] on the record, well, do you even know where [Kaualoku] is? He said no. Prosecution doesn't know. Similarly, this prosecution doesn't know where [Denton] is, and the prosecution doesn't even know if these people exist, so for the defense to create this strong man argument that these people exist and says the prosecution knows they exist, when there's no proof the prosecution knows they exist, the defense didn't provide any actual statement of either witness, no conclusive contact because the prosecution never got contact with ei-

ther of these people, there's no people to believe they exist.

[DEFENSE COUNSEL]: If the Court will recall, I gave [Deputy Prosecutor] [Kaualoku's] number. If [Kaualoku] never called him back, that's not my problem, but I suggest the prosecution knows these people exist, and to suggest to the jury we're making these people up under the circumstances, my argument is that's misconduct and I ask for mistrial.

THE COURT: Motion for mistrial is denied. Objection is overruled. You may proceed.

Third, the prosecution stated in its closing argument:

Another reason why you know self-defense doesn't apply, before I go on, is because self-defense, as I mentioned earlier, says the actor says I did it, I meant to do it, but I have an excuse. What did [Kekona] tell you yesterday? Hey, I wasn't trying to kill anybody, I was just trying to scare him. And if you believe that that's all he was doing, then self-defense doesn't apply either, because an actor who says self-defense says I did it—

Kekona's counsel objected that this statement was a misstatement of law. The circuit court overruled Kekona's objection.

The prosecution further argued that if Kekona were innocent and acted in self-defense, he would not have had Antonio lie for him:

Let me wrap this up then with this concept: Under the law, there's a principle known as consciousness of guilt, meaning guilty people act in a certain way. A person who's innocent, who believes that he was acting in self-defense or defense of others, doesn't run away. He doesn't hide out. He doesn't ditch the gun. *He doesn't have his girlfriend lie to the police.* What did [Kekona] do?

(Emphasis added.) During the bench conference that followed, Kekona's attorney objected to this statement on the ground that there was no evidence to indicate that Kekona had told Antonio to lie to the police. Defense counsel noted that the prosecution had represented at the hearing on the motion in limine

that it was going to introduce the statement by Antonio that she had shot Ah Loo for the limited purpose of proving that there was a gun in the car; therefore, it was misconduct for the prosecution to use Antonio's statement to suggest that Kekona had told Antonio to lie to the police. The circuit court stated to the deputy prosecutor:

> You can argue with respect to her not being truthful with respect to where [Kekona] was, but not with respect to her shooting the gun. That came in for the limited purpose, but there is no limitation on his testimony with respect to her being with him, and that's just argument whether she lied to the police or not about that.

Finally, the prosecution argued on rebuttal that Kekona could have, but did not, confront Ah Loo regarding the allegations that he had abused Antonio:

> Furthermore, the defense would have you believe that [Kekona], at the time, had certain beliefs based on what [Antonio] told him. Aside from what [Kekona] said, think about the evidence. [Defense counsel] had an opportunity to confront [Ah Loo] about these allegations of abuse. Did he? No. There was his chance. Isn't it true, [Ah Loo], that you beat [Antonio], choked her? Never asked him that.
>
> . . . .
>
> . . . On cross-examination, the defense had an opportunity to confront [Ah Loo] with these allegations of abuse; that did not happen. That means other than what [Kekona] says [Antonio] told him, that's the only—that's the only evidence of abuse, and that's not evidence.
>
> Defense would have you believe that [Kekona] was in a heightened state of mind, these were his beliefs, and et cetera, et cetera, et cetera. What did he tell you? Things are nuts, was crazy. He was tripping. He couldn't even get it straight if the van was going back, coming forward, was stopped. When pressed on that point, what was his response? I cannot answer that, I cannot answer that. Well, it's time to answer, because that's why there's a trial.
>
> The right man is on trial. The right charges have been brought. You have

been instructed on the law. You know what the credible evidence is. As such, it is time to disregard what you think is possible and focus on what is—on what is reasonable, and the reasonable evidence, based on your common sense, tells you that the defendant is guilty of each and every allegation brought against him in this trial.

> . . . .

> [DEFENSE COUNSEL]: May we approach, Your Honor?

> THE COURT: You may.

(The following proceedings were held at the bench:)

> [DEFENSE COUNSEL]: Your Honor, I move for mistrial again. . . .

> But to suggest to the jury that I had an opportunity to cross-examine on the beatings, knowing that I could not, is serious, and I suggest that that is prosecutorial misconduct and that the Court should grant a mistrial at this point of the proceedings.

> [DEPUTY PROSECUTOR]: That's incorrect. He had full and fair opportunity. He could have confronted [Ah Loo] on that, whether or not anything could've come up. That's not my problem. He could have confronted him.

> [DEFENSE COUNSEL]: It's the way he put it to the jury. He didn't restrict that [defense counsel] could've asked what happened on the 14th.

> THE COURT: That's why the Court has sustained the objections. . . . Motion for mistrial is denied.

On March 27, 2007, the jury returned verdicts of "[g]uilty as charged" on all counts. This appeal followed.

## DISCUSSION

A. *Whether the Circuit Court Erred in Granting the State's Motion in Limine to Prohibit the Defense From Introducing Evidence of Prior Acts of Physical Abuse of Antonio by Ah Loo*

Kekona argues that the circuit court erred when it "granted the State's motion in limine

to prohibit the defense from introducing evidence of prior acts of physical abuse of [Antonio] by [Ah Loo,]" on grounds of relevance, confusion of the issues, and undue prejudice. (Formatting altered.) According to Kekona, the circuit court's error "was not harmless" because "the prior acts of abuse constituted proof of bias, interest, or motive which would have discredited the State's theory that Ah Loo did not engage in a dangerous car chase which endangered the lives of [Antonio, Kekona, Kaualoku, and Denton]; furthermore, the excluded acts of prior physical abuse was [sic] relevant to support [Kekona's] theory of self[-]defense and defense of others." (Formatting altered.) We agree with Kekona.

### 1.

■■■■ A trial court's order granting a motion in limine "is an evidentiary decision based upon relevance and is therefore reviewed under the right/wrong standard." *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002). "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Timoteo*, 87 Hawai'i 108, 113, 952 P.2d 865, 870 (1997) (internal quotation marks omitted).

HRE Rule 401 (1993) defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 404(a)(2) (Supp.2008) currently provides as it did at all times relevant to this case, in relevant part, as follows:

> **Character evidence not admissible to prove conduct; exceptions; other crimes.** (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
>     . . . .
>
> (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

The commentary to HRE Rule 404(a)(2) (1993) observes that the subsection is mainly applicable to homicide and assault cases. The commentary further states:

> In *State v. Lui*, 61 H.[Haw.] 328, 603 P.2d 151 (1979), the court observed: "[A] defendant who claims self-defense to a charge of homicide is permitted to introduce evidence of the deceased's violent or aggressive character either to demonstrate the reasonableness of his apprehension of immediate danger or to show that the decedent was the aggressor." For the first purpose, noted the Lui court, there must be a foundation showing that the accused knew of the deceased's character "or of the specific acts of violence committed." But such a foundation "is not required where the factual issue is to determine the aggressor." The evidence was properly excluded in Lui because, since the defendant shot the unarmed victim at a distance of ten feet, there was simply no "factual dispute as to who was the aggressor."
>
> After a character attack on the victim by the accused, or after any defense evidence that the victim "was the first aggressor," subsection (a)(2) allows the prosecution to prove the peaceful character of the victim in rebuttal. This is consistent with the result in *State v. Clyde*, 47 H.[Haw.] 345, 388 P.2d 846 (1964).

In *State v. Lui*, 61 Haw. 328, 329–30, 603 P.2d 151, 153 (1979) (per curiam), the defendant, after getting into a fist fight with the decedent, went home, grabbed a handgun, and returned to the scene of the fight. While talking to a friend who was in a parked car, the defendant noticed the decedent approaching, disengaged from the conversation, and shot the decedent while the decedent was approximately ten feet away. *Id.* at 330, 603 P.2d at 153. The defendant testified that he thought the decedent was reaching for a

gun; however, the decedent was not armed. *Id.*, 603 P.2d at 153.

On appeal, the defendant claimed that he was denied the right to present evidence when the trial court refused to admit character evidence of specific acts of prior violence committed by the decedent. *Id.* at 330, 603 P.2d at 153–54. The Hawai'i Supreme Court initially observed that at common law,

> a defendant who claims self-defense to a charge of homicide is permitted to introduce evidence of the deceased's violent or aggressive character either to demonstrate the reasonableness of his [or her] apprehension of immediate danger or to show that the decedent was the aggressor. And, where character evidence is offered to show the reasonableness of the defendant's apprehension, he [or she] must lay a foundation, prior to the admission of the evidence, that he [or she] knew at the time of the homicide of the deceased's reputation or of the specific acts of violence committed. This foundation is required because the evidence is probative of the defendant's state of mind, showing his [or her] belief or corroborating his [or her] knowledge as to the deceased's character and tending to prove that he [or she] acted as a reasonably prudent person would under similar beliefs and circumstances. But, the foundation is not required where the factual issue is to determine the aggressor. Proof of the deceased's violent and turbulent character in this situation is circumstantial evidence of the likelihood of his [or her] being the aggressor and of the absence of provocation on the part of the defendant.

> Although Hawaii's laws on justification supersede the common law defense of self-defense, nevertheless, the common law rules on character evidence are applicable.

> Deceased's conviction record was properly excluded. Absent the required foundation that appellant knew of each of the specific events of the conviction at the time of the homicide, it was inadmissible as proof of the reasonableness of his belief that deadly force was immediately necessary. Appellant's testimony as to his knowledge of all three acts was limited to a single statement that he knew of assaults in Waikiki. Without a more complete connection between appellant's knowledge of the assaults and the conviction record, the foundation was inadequate to justify admission.

> The trial court also properly excluded the proffered evidence to show by circumstantial proof that the deceased was the aggressor in the fatal incident.

> The record does not support a factual dispute as to who was the aggressor. The State did not seek to establish the applicability of [HRS] § 703–304 by showing that the [defendant] "with intent to cause death or serious bodily injury, provoked the use of force against himself."

> Where the details of the fatal encounter are free from doubt, a defendant cannot bootstrap into evidence the character of deceased to serve improperly as an excuse for the killing under the pretext of evidencing deceased's aggression.

*Id.* at 330–32, 603 P.2d at 154 (citations and footnotes omitted).

In *State v. Basque*, 66 Haw. 510, 511, 666 P.2d 599, 601 (1983), the State filed a motion in limine to preclude the defendant from arguing to the jury or introducing into evidence the criminal record of the deceased victim. The defendant maintained that "such evidence was admissible to show who was the aggressor in the incident, a critical aspect [of his] claim that he acted in self-defense." *Id.* at 512, 666 P.2d at 601. After balancing the State's interests against those of the defendant, the trial court granted the motion, holding that jurors might place too much emphasis on the deceased's criminal record. *Id.*, 666 P.2d at 601.

On appeal, the supreme court held that the trial court abused its discretion in granting the motion. *Id.* at 515, 666 P.2d at 603. The supreme court initially observed that the testimony at trial was "unclear and conflicting as to who was the aggressor" and "uncontroverted testimony was adduced that the deceased had drunk about eight beers that afternoon, and in approaching [the defendant], had pushed aside [the defendant's former girlfriend] and shaken the car." *Id.* at

513, 666 P.2d at 601–02. The supreme court remarked:

> Given such testimony, it is evident that a factual question existed as to who was the aggressor in this case. The trial court implicitly acknowledged as much when, as part of its "self-defense" jury instruction, it stated: "In order for the defendant to have been justified in the use of deadly force in self-defense, he must not have provoked the assault on him or have been the aggressor."
>
> . . . .
>
> . . . [T]he instant case is unlike *State v. Lui, supra.* The rule in *Lui* regarding the use of a victim's criminal record to establish who was the aggressor, however, is applicable. That rule was later codified as Rule 404(a)(2) of the Hawaii Rules of Evidence. . . . The State contends that this provision allows only the use of character evidence—to be proved by reputation or opinion—and not evidence of "other crimes, wrongs, or acts," which is covered by [HRE] Rule 404(b).
>
> In *Lui*, however, we treated general character evidence and specific prior acts (including those reflected in the victim's criminal record) the same for purposes of corroborating a defendant's self-defense claim as to who was the aggressor. A growing number of other courts are in accord. As Dean Wigmore has stated: "There is no substantial reason against evidencing the character (of a deceased victim) by *particular instances of* violent or quarrelsome *conduct.* Such instances may be very significant; their number can be controlled by the trial court's discretion; and the prohibitory considerations applicable to an accused's character have here little or no force."
>
> . . . .
>
> We also noted in *Lui* that where the issue of who was the aggressor is in dispute, the defendant need not lay a foundation showing that he knew of the victim's character or prior bad acts. This is because "proof of the deceased's violent and turbulent character in this situation is circumstantial evidence of the likelihood of his being the aggressor and of the absence of provocation on the part of the defendant."
>
> It was thus not necessary for [the defendant] to have laid a foundation as to what he knew of the deceased's criminal record. It was sufficient that there have been a factual issue as to who was the aggressor. Such an issue, if not apparent at the outset of the trial when [the defendant] made clear that he intended to rely on a self-defense theory, certainly became manifest during trial when the conflicting testimony of the experts and witnesses to the shooting was presented.
>
> . . . .
>
> We realize that it resides within the sound discretion of the trial court to determine whether there exists sufficient good reason for evidence of the deceased's criminal record to be introduced or argued during trial. We are mindful of the potential dangers such evidence presents. In this case, however, the court itself recognized in its jury instructions that there existed a genuine factual dispute as to whether the [defendant] or the deceased was the aggressor. Under such circumstances, we conclude the court abused its discretion when it flatly prohibited [the defendant] from arguing to the jury, or otherwise eliciting evidence of, the criminal history of the deceased. We cannot say beyond a reasonable doubt that such an abuse did not contribute to the jury's verdict.

*Id.* at 513–15, 666 P.2d at 602–03 (citations, footnote, and some brackets omitted). *See also State v. Estrada,* 69 Haw. 204, 215, 738 P.2d 812, 821 (1987) (holding that prior bad acts of a police officer, "which indicate a propensity for violence, aggression, or abuse of police powers, . . . were highly relevant to [the defendant's] self-defense claims"); *State v. Adam,* 97 Hawaiʻi 413, 418, 38 P.3d 581, 586 (App.2001) (holding that "when the factual issue is, as between the defendant and the other person, who was the aggressor, the defendant may introduce evidence of the other person's violent or aggressive character"); *State v. Maddox,* 116 Hawaiʻi 445, 458, 173 P.3d 592, 605 (App.2007) (holding that before a "defendant is entitled to introduce evidence

of the victim's character for violence, there must be sufficient evidence to support a finding that the victim was the first aggressor"; and that once the defendant testified that he was attacked and cut by the victim without provocation before using the victim's utility tool to stab the victim, the defendant was "clearly entitled" to question the victim about past acts of violence reflected in court documents from the State of Oregon).

In this case, it is unclear from the record whether Kekona, at the time he shot at Ah Loo's van, was aware of any specific acts of abuse by Ah Loo against Antonio that occurred prior to December 14, 2005.[6] In any event, however, there was much conflicting evidence produced at trial as to whether Ah Loo was the first aggressor who had used his van as a deadly weapon to ram Antonio's car into ongoing traffic and endanger the lives of the occupants of Antonio's car. Ah Loo's prior abuse was circumstantial evidence of the likelihood that Ah Loo was the first aggressor in the events that led up to the shooting incident in the Waimalu Shopping Plaza. Therefore, it was an abuse of discretion for the circuit court to preclude Kekona from introducing evidence of Ah Loo's prior abuses of Antonio.

### 2.

■ During the proceedings below, the State argued that its motion in limine should be granted because Kekona had failed to comply with HRE Rule 404(b) and provide reasonable notice in advance of trial of the date, location, and general nature of the evidence of Ah Loo's prior abuse of Antonio

that Kekona intended to introduce into evidence at trial. In *State v. Pond,* 117 Hawai'i 336, 350, 181 P.3d 415, 429 (App.2007), vacated on other grounds by *State v. Pond,* 118 Hawai'i 452, 193 P.3d 368 (2008), this court observed that the purpose of the notice required by HRE Rule 404(b) "is to reduce surprise and promote early resolution of admissibility questions." We also adopted the case-by-case approach for assessing the reasonableness of the notice required by HRE Rule 404(b). *Pond,* 117 Hawai'i at 349–50, 181 P.3d at 428–29.

In this case, the State's motion in limine sought to resolve, prior to trial, the admissibility of Ah Loo's alleged prior abuse of Antonio. The circuit court did not rely on Kekona's failure to comply with HRE Rule 404(b) as a basis for granting the State's motion in limine. Moreover, it appears that the State, by seeking to preclude such evidence from being offered at trial, had notice that Kekona intended to support his defense with evidence of Ah Loo's prior abuse of Antonio.

### B. *Whether the Prosecution Misstated the Law of Self-Defense*

■ HRS § 703–304 (1993 & Supp.2008) currently states, as it did at the time Kekona was accused of committing the offenses he was charged with, in relevant part, as follows:

**Use of force in self-protection.** (1) Subject to the provisions of this section . . ., the use of force upon or toward another person is justifiable when the actor believes that such force is immediately

---

6. After the circuit court orally granted the State's motion in limine to preclude evidence of prior acts of abuse by Ah Loo, Kekona's counsel asked the circuit court: "[I]f [Kekona] testifies that he was aware of the prior acts of abuse by [Ah Loo], would that make it relevant?" Kekona's counsel elaborated that

    if [Kekona] knew that Ah Loo had beaten [Antonio] prior to this as they're being pursued, you know, if he's finding out that this guy had beaten her in the past and she doesn't want to stop, wouldn't it make it relevant because now he has the state of mind to realize that there's something dangerous going on.

    Because if you think about it, if somebody bangs your car and you don't know why, and then they continue to chase you and follow you

every place you go and if you make a circle to get away and the person goes in a circle with you and bangs your car again, you're gonna ask the driver what's going on. If the driver tells you "That's my boyfriend, and I don't want to stop because this guy has beaten me before," would that not have a bearing on his understanding of what the situation is about? The circuit court reiterated that its ruling "would most likely be the same. Irrelevant, immaterial." It does not appear from the record that Kekona ever laid a foundation that at the time he shot at Ah Loo's van, he was aware of the prior acts of abuse by Ah Loo and thus acted as a reasonably prudent person would have, based on such awareness.

necessary for the purpose of protecting himself [or herself] against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself [or herself] against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he [or she] believes them to be when the force is used without retreating, surrendering possession, doing any other act which he [or she] has no legal duty to do, or abstaining from any lawful action.

. . . .

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself [or herself] in the same encounter; or

(b) The actor knows that he [or she] can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he [or she] abstain from any action which he [or she] has no duty to take[.]

"Deadly force" is defined as

force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm. Intentionally firing a firearm in the direction of another person or in the direction which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehen-

sion that the actor will use deadly force if necessary, does not constitute deadly force.

HRS § 703–300 (1993).

"Unlawful force" is defined as

force which is employed without the consent of the person against whom it is directed and the employment of which constitutes an offense or would constitute an offense except for a defense not amounting to a justification to use the force. Assent constitutes consent, within the meaning of this section, whether or not it otherwise is legally effective, except assent to the infliction of death or serious or substantial bodily injury.

HRS § 703–300. Furthermore, " '[b]elieves' means reasonably believes." HRS § 703–300.

In instructing the jury as to the law applicable to this case, the circuit court gave the following instruction as to self-defense:

Justifiable use of force—commonly known as self-defense—is a defense to the charges of Attempted Murder in the Second Degree, Attempted Assault in the First Degree, Attempted Assault in the Second Degree, and Reckless Endangering in the First Degree, and Carrying, Using or Threatening to Use a Firearm While Engaged in the Commission of a Separate Felony. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution does not meet its burden, then you must find the defendant not guilty.

The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself [or herself] on the present occasion against the use of unlawful force by the other person.

The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself [or herself] on the present occasion against death or serious bodily injury. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself [or herself] in the same encounter, or if the defendant knows that he [or she] can avoid the necessity of using such force with complete safety by retreating.

"Force" means any bodily impact, restraint or confinement, or the threat thereof.

"Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force or deadly force.

"Deadly force" means force which the actor uses with the intent of causing, or which he [or she] knows to create a substantial risk of causing[ ] death or serious bodily injury.

Intentionally firing a firearm in the direction of another person or in the direction which the person is believed to be constitutes deadly force.

During closing argument, the prosecution argued that for self-defense to be applicable,

the actor says I did it, I meant to do it, but I have an excuse. What did [Kekona] tell you yesterday? Hey, I wasn't trying to kill anybody, I was just trying to scare him. And if you believe that that's all he was doing, then self-defense doesn't apply either, because an actor who says self-defense says I did it—

. . . .

. . . . An actor who says I'm acting in self-defense says I did it, I meant to do it, I have an excuse. [Kekona] says I did it but I wasn't trying to kill anybody. Self-defense doesn't apply.

The circuit court overruled Kekona's objection to the foregoing argument and directed the prosecution to proceed.

Kekona claims that the prosecution's argument regarding self-defense misstated the law. We agree.

We note initially that based on the statutory elements of the offense of attempted murder in the second degree, the State was required to establish beyond a reasonable doubt that Kekona intentionally engaged in conduct which, under the circumstances as Kekona believed them to be, constituted a substantial step in a course of conduct intended or known by Kekona to cause the death of Ah Loo. HRS §§ 705–500, 707–701.5, and 706–656. Therefore, if the jury believed that Kekona was only trying to scare Ah Loo when Kekona shot the gun, there would be insufficient evidence to convict Kekona of attempted murder in the second degree.

The prosecution used Kekona's claim that he intended only to scare Ah Loo to argue at trial that self-defense does not apply if Kekona did not intend to kill Ah Loo. On appeal, the prosecution similarly maintains:

[Kekona] thus used "deadly force" in this instance because "[i]ntentionally firing a firearm in the direction of another person or in the direction which another person is believed to be constitutes deadly force." HRS Section 703–304 (1993 Repl.). And in using "deadly force," Defendant acted *"with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm."* *Id.* (emphasis supplied). Thus, in employing deadly force by firing his gun directly at Ah Loo, [Kekona] could not have done so with the intent to frighten Ah Loo; rather, he did so at least with the intent "to create the substantial risk of causing death or serious bodily harm." The jury received this statutory definition of "deadly force." 3/22 TR. at 27:13–16. Neither

misconduct nor misstatement of law occurred here.

(Emphasis and some brackets in original.)

The prosecution's argument appears to be that because Kekona intentionally fired his gun toward Ah Loo, Kekona used "[d]eadly force[,]" which by definition means that Kekona had the intent "to create the substantial risk of causing death or serious bodily harm." Therefore, Kekona could not rely on the defense of self-protection if he denied intending to kill or cause serious bodily harm to Ah Loo. This argument is a bit circular and confusing, and incorrect.

It was uncontested in this case that Kekona used "deadly force," as that term is defined in HRS § 703–300, when he "[i]ntentionally fir[ed] a firearm in the direction of [Ah Loo] or in the direction which [Ah Loo was] believed to be[.]" HRS § 703–300. Pursuant to HRS § 703–304, the use of deadly force upon or toward another person is justifiable when: (1) "the actor believes that such force is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by the other person on the present occasion[,]" HRS § 703–304(1); and (2) "the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy[,]" HRS § 703–304(2); except that (3) pursuant to HRS § 703–304(5), "[t]he use of deadly force is not justifiable" if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself [or herself] in the same encounter; or

(b) The actor knows that he [or she] can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he [or she] abstain from any action which he [or she] has no duty to take, except that:

(i) The actor is not obliged to retreat from his [or her] dwelling or place of work, unless he [or she] was the initial aggressor or is assailed in his [or her] place of work by another person whose place of work the actor knows it to be; and

(ii) A public officer justified in using force in the performance of his [or her] duties, or a person justified in using force in his [or her] assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his [or her] duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

The commentary to HRS § 703–304 explains the defense of self-protection, in relevant part, as follows:

Subsection (1) requires a belief by the actor that the use of protective force is actually necessary, and that unlawful force (defined in § 703–300) is to be used by the assailant. He [or she] must believe, further, that immediate use of force is required, although the threatened harm to him [or her] need not be "imminent," as the rule was sometimes phrased at common law. It is enough that unlawful force is threatened on the present occasion by his [or her] assailant. The actor may make his [or her] defensive move without waiting for his [or her] assailant to load his [or her] gun or to summon reinforcements. Finally, the actor must believe that the particular degree of force used by him [or her] is necessary. This formulation is not meant to require a precise equation, but it will limit the defense to situations in which a particular scope and degree of retaliation is believed by the actor to be appropriate to the aggression.

Subsections (2) and (5) strictly limit the use of deadly force. Under the circumstances specified in subsection (2), the actor may use deadly force if he [or she] believes it is necessary to protect himself [or herself] against death, serious bodily harm, kidnapping, rape, or forcible sodomy. This formulation has two implications: (a) the actor must believe that deadly force is the only viable means of preventing the specified harm, and (b) the

actor must believe that one of the specified harms is threatened on the present occasion. "Deadly force" is defined in § 703–300. Its use is further restricted by subsection (5). Deadly force may not be used if the actor provoked his [or her] assailant's use of force against himself [or herself] in the same encounter with the purpose of causing death or serious bodily injury. Of course, if he [or she] intends only moderate harm and receives a deadly response, the initial aggressor may respond with deadly force. The use of deadly force is also denied when the actor can avoid using it with complete safety by retreating, by surrendering possession of a thing to a person asserting a claim of right to it, or by complying with a demand that he [or she] refrain from taking an action which he [or she] has no legal duty to take. In any of these cases, the Code may seem to be opting for cowardice. However, it should be the strong principle of any criminal code to prevent death wherever possible.

There was ample evidence adduced at trial to support Kekona's defense of self-protection and thereby place "the burden ... on the prosecution to disprove the facts that have been introduced or to prove facts negativing the defense and to do so beyond a reasonable doubt." *State v. Van Dyke*, 101 Hawai'i 377, 386, 69 P.3d 88, 97 (2003) (internal quotation marks omitted). Therefore, the crucial issues that the jury had to decide as to this defense were: (1) whether Ah Loo used "unlawful force" against Kekona on the occasion in question; (2) whether Kekona believed that his use of deadly force was "immediately necessary for the purpose of protecting himself against the use of unlawful force by [Ah Loo]," HRS § 703–304(1); [7] and (3) whether Kekona reasonably "believe[d]

that deadly force [wa]s necessary to protect himself against death [or] serious bodily injury[.]" HRS § 703–304(2).[8] The fact that Kekona may not have intended to kill Ah Loo was not a relevant factor in determining Kekona's justification defense of self-protection.

■■■ In *State v. Espiritu*, 117 Hawai'i 127, 176 P.3d 885 (2008), the Hawai'i Supreme Court held that arguments by a prosecutor which misstate the law are reviewed on appeal according to the harmless-beyond-a-reasonable-doubt standard. *Id.* at 140, 176 P.3d at 898. "This standard 'requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'" *Id.* at 141, 176 P.3d at 899. In *Espiritu*, the supreme court determined that the prosecutor's argument misstated the law regarding the extreme-mental-or-emotional-disturbance (EMED) defense because "[i]t placed on Petitioner the burden of proving a special relationship between the Complainant and Petitioner and an immediacy in the event that the law did not require." *Id.* at 142–43, 176 P.3d at 900–01. The supreme court observed that

[a]lthough the court did instruct the jury as to the elements of an attempted manslaughter defense, Respondent argued in effect that such a special relationship and immediacy were necessary to establish an extreme mental or emotional disturbance for which there was a reasonable explanation. Obviously such is not the case. The jury was not disabused of this error. Because Petitioner's counsel's objections to these arguments were overruled, the jury

---

7. HRS § 703–304(1) provides:
   **Use of force in self-protection.** (1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by the other person on the present occasion.
   HRS § 703–308 (1993) relates to the use of force to prevent suicide or the commission of a crime.

8. HRS § 703–304(2) provides:
   **Use of force in self-protection.** ...
   (2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself [or herself] against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

would reasonably perceive that the misstatement of the law was not incorrect.

*Id.* at 143, 176 P.3d at 901.

The supreme court acknowledged that "[i]f improper comments are made by a prosecutor, 'harm or prejudice to [a defendant] can be cured by the court's instructions to the jury.'" *Id.* (quoting *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626 (1981)) (some brackets in original). However, no curative instruction was given in *Espiritu*, 117 Hawai'i at 143, 176 P.3d at 901. Moreover, although the trial court had instructed the *Espiritu* jury that "statements or remarks made by counsel are not evidence[,]" the supreme court held that such instruction "is inapposite inasmuch as the specific misstatements in question have to do with *law* and not evidence.... [T]hat instruction did not clarify to the jury that a special relationship between parties and immediacy of action are not required for application of the EMED defense." *Id.*, 176 P.3d at 901 (internal quotation marks and brackets in original omitted). The supreme court also mentioned that

> a prosecutor's improper statements "in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office."

*Id.*, 176 P.3d at 901.

In this case, the prosecution clearly misstated the law concerning self-defense by incorrectly imputing a requirement that Kekona must have intended to kill Ah Loo in order for the defense of self-protection to apply. The circuit court did not correct this misstatement of law by sustaining defense counsel's objection to the misstatement, nor did the court cure the misstatement of law in its jury instructions. If the jury believed this misstatement of law, it would have incorrectly concluded that the defense of self-protection was inapplicable since Kekona clearly stated that he never intended to kill Ah Loo.

In light of the record, we hold that the prosecution's misstatement of law was not harmless error.

### CONCLUSION

In light of the foregoing discussion, we vacate the judgment entered by the circuit court on June 4, 2007 and remand for a new trial. Our disposition of Kekona's arguments as to the motion in limine and the prosecution's misstatement of the law as to the defense of self-protection renders it unnecessary to address Kekona's remaining points on appeal.